

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-7-1995

# Ragan v Tri-County Excavating

Precedential or Non-Precedential:

Docket 94-1388

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Ragan v Tri-County Excavating" (1995). *1995 Decisions.* Paper 209.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/209

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

----------

Nos. 94-1388 and 95-1189

----------

MICHAEL J. RAGAN, AS ADMINISTRATOR AND FIDUCIARY OF THE
INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL NO. 542
PENSION, HEALTH AND WELFARE, APPRENTICESHIP, TRAINING AND
SAFETY, SUPPLEMENTAL UNEMPLOYMENT BENEFIT AND ANNUITY FUNDS;
INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 542

v.

TRI-COUNTY EXCAVATING, INC.;
UNITED STATES FIDELITY AND
GUARANTY COMPANY;
HARTFORD FIRE INSURANCE
COMPANY

Hartford Fire Insurance Company,
Appellant

----------

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 92-00066)

----------

Argued Monday, October 24, 1994

BEFORE:  STAPLETON, HUTCHINSON, and GARTH, Circuit Judges

----------

(Opinion filed August 7, 1995)

----------

Sam L. Warshawer, Jr. (Argued)
Edward Seglias
Venzie, Phillips & Warshawer
2032 Chancellor Street

Philadelphia, Pennsylvania 19103

Attorneys for Appellant

Robert T. Carlton, Jr. (Argued)
McAleese, McGoldrick & Susanin
455 South Gulph Road
Suite 240 – Executive Terrace
King of Prussia, Pennsylvania 19406

Attorneys for Appellees

----------

OPINION OF THE COURT

----------

GARTH, Circuit Judge:

Defendant–Appellant Hartford Fire Insurance Company is the surety on a labor and material payment bond purchased by Mele Construction Co., Inc. ("Mele"). Hartford's bond required prospective claimants who were not in a "direct contract" with Mele to give written notice of their claims within 90 days after they ceased work. Plaintiffs-appellees, tardy claimants on Hartford's bond, are the International Union of Operating Engineers, Local 542 and Michael J. Ragan as administrator of various "fringe benefit" funds associated with Local 542 (collectively, "Local 542").

Local 542 had a collective bargaining agreement with Tri–County Excavating, Inc., a corporation owned by the three daughters of John Mele, president of Mele. Hartford rejected Local 542's claim, made roughly 120 days after Local 542 ceased work, because Local 542 was not in a "direct contract" with Mele and so was required to give notice of its claim within 90 days of the last labor performed. Local 542 responded that Tri–County

3

was the corporate "alter ego" of Mele, and that inasmuch as Local 542 had contracted with Tri-County it had, ipso facto, contracted with Mele.

Following a bench trial, the district court held that Tri-County was indeed the alter ego/instrumentality of Mele and entered judgment in favor of Local 542. The district court held that under the terms of the bond Hartford was liable to Local 542 for Tri-County's unpaid "fringe benefit" contributions, union dues, liquidated damages and attorney fees.

On appeal, Hartford advances three arguments: first, that the district court erred in its alter ego determination under Pennsylvania law; second, that the Employees Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA"), preempts Local 542's state-law action on the bond; and third, that the bond does not obligate Hartford to pay liquidated damages and attorney fees.

We agree with all of the district court's holdings except its holding that Hartford was obliged to pay liquidated damages and attorney fees. Consequently, we will affirm the district court's award of unpaid fringe benefit contributions and union dues. However, because we conclude that Hartford cannot be held liable for attorney fees and liquidated damages, we will reverse so much of the district court's orders of March 2, 1994, and February 15, 1995, as granted judgment against Hartford for those damages. We will accordingly remand to the district court with directions that its judgment against Hartford and in favor

4

of Local 542 on Count IV be modified to delete all awards of attorney fees and liquidated damages.

I.

Mele purchased the bond ("the Bond") from Hartford to cover Mele's wage and labor obligations in connection with earth work which Mele was hired to perform on Crown America Corporation's Viewmont Mall project in Lackawanna County, Pennsylvania. Crown is named as obligee on the bond.

For the past twenty years Mele, which owns heavy earth moving equipment, has sub-contracted with Tri-County on a job-by-job basis whereby Tri-County provided operating engineers to operate Mele's earth moving equipment. Tri-County is part of a group of at least five companies owned by the extended Mele family.

Under its contracts with with Mele, Tri-County would furnish Mele with Tri-County employees who were members of Local 542. Tri-County and its employees were subject to the terms of a Collective Bargaining Agreement ("CBA"), negotiated between Local 542 and Tri-County in 1988, and a Pension Fund Agreement ("PFA") entered into between Local 542 and the General Building Contractors Association and the Contractors Association of Eastern Pennsylvania and Delaware in 1974.

When Crown hired Mele for the Viewmont project in the Summer of 1990, Mele looked to Tri-County for operating engineers and, as it had done in the past, Tri-County engaged members of Local 542 pursuant to the CBA and PFA. As is particularly

5

relevant to the present dispute, the CBA obligated Tri-County to make regular "fringe benefit" contributions to Local 542's Pension, Health and Welfare, Apprenticeship, Training and Safety, Supplemental Unemployment Benefit, and Annuity funds (the "Funds") during the time that Local 542 members were in Tri-County's employ. The CBA also required Tri-County to pay "supplemental union dues" and provided for the payment of a specific monetary penalty should Tri-County become delinquent in its fringe benefit contributions. The PFA provided that in the event of a lawsuit against an employer to collect unpaid contributions, the employer was obliged to pay costs and reasonable attorney fees.

Work on the Viewmont project commenced some time in August of 1990, and Tri-County began making the required fringe benefit contributions to the Funds as required by the CBA.

The Viewmont project foundered in the spring of 1991, with disastrous results: Crown stopped paying Mele, Mele fell behind in progress payments to Tri-County, and Tri-County in turn failed to make the fringe benefit contributions to the Funds for the period March-June, 1991. Within months, Mele had filed for bankruptcy and Tri-County became insolvent. By this time the Funds were owed roughly $78,000.00 in unpaid contributions.

On or about November 1, 1991, Local 542, having been informed by Tri-County that it was unable to satisfy its obligations to the Funds, turned to Hartford for payment.

Hartford's Bond contained the following provision:

6

> No suit or action shall be commenced
> hereunder by any claimant, (a) unless
> claimant, <u>other than one having a direct
> contract with the principal</u>, shall have given
> written notice to any two of the following:
> the principal, the owner or the surety. . .,
> <u>within ninety days after such claimant did or
> performed the last of the work or labor</u> . . .
> for which said claim is made.

App. 97 (emphasis added).

Under this provision, all claimants who had not contracted directly with Mele were required to give written notice to any two of Mele, Hartford or Crown within 90 days after ceasing work.

As shown by Tri-County records, the "last labor" provided by Local 542 on the Viewmont job was for the week ending June 28, 1991. Local 542 did not give notice of its claim until on or about November 1, 1991, more than 120 days after "last labor" was performed. Hartford rejected Local 542's request on the ground that Local 542 had failed to make timely notice of its claim.

On January 3, 1992, Local 542 commenced this action in the federal district court for the Eastern District of Pennsylvania on the basis of diversity of citizenship, seeking delinquent fringe benefit contributions, union dues, liquidated damages and attorney fees.[0] Local 542 claimed that Tri-County

---

[0] Also named as defendants in Local 542's complaint were Tri-County (Counts I and II) and United States Fidelity and Guaranty Company ("USF&G"), another surety for Mele on a different construction project (Count III). Tri-County did not defend itself below, and a default judgment was entered against Tri-County in the district court. Tri-County has not appealed.

Sometime following the commencement of this action Local 542 and USF&G entered into a settlement agreement and Local

7

was Mele's alter ego, and that Local 542 was therefore in a "direct contract" with Mele and so was not subject to the bond's 90 day notice provision.

The district court agreed with Local 542. Following a bench trial, the district court, by order dated March 2, 1994, entered judgment against Hartford and awarded Local 542 $78,794.79 in unpaid fringe benefit contributions, $5,719.11 in unpaid union dues, and $42,190.21 in liquidated damages, less $480.00 in prepayment. The district court also awarded reasonable attorney fees to Local 542, but did not quantify those fees until it entered its order of February 15, 1995, which set attorney fees at $19,881.73.

Hartford appealed from the district court's March 2, 1994 order on March 29, 1994, and timely appealed the February 15, 1995 order.[0]

## II. Appellate Jurisdiction

As noted above, the district court's March 2, 1994 order entered judgment in favor of Local 542 and among other things awarded reasonable attorney fees but did not quantify the

542 dismissed its action against USF&G pursuant to Federal Rule of Civil Procedure 41(a)(1). Accordingly, the instant appeal concerns only Count IV of the Complaint, naming Hartford as defendant.

[0] After the district court entered its order quantifying attorney fees, Hartford filed another appeal at docket no. 95-1189 which challenged the award itself, but did not contest the amount of fees awarded. That appeal was limited to "the issue of the Benefit Funds' entitlement to attorney fees as previously briefed and argued," (Stipulation of Counsel for Consolidation of Appeals, ¶ 9), and has been consolidated with the present appeal. Both parties agreed that the issue raised in 95-1189 with respect to attorney fees is identical to the attorney fees issue raised in the earlier appeal at 94-1388.

amount of those fees.  Although Hartford appealed the March 2, 1994 order on March 29, 1994, it was not until February 15, 1995 that the district court entered an order setting attorney fees at $19,881.73.  Neither party questioned the jurisdiction of this court to hear Hartford's appeal.  However, we must consider our appellate jurisdiction as a threshold matter.  See Trent Realty Associates v. First Fed. Sav. and Loan Ass'n of Philadelphia, 657 F.2d 29, 36 (3d Cir. 1981) ("A federal court is bound to consider its own jurisdiction preliminary to consideration of the merits.").

The district court's award of attorney fees was premised on a provision in the Pension Fund Agreement between Local 542 and Tri-County which provides that in the event of a lawsuit to collect delinquent contributions the employer "shall pay all costs and reasonable attorney's fees incurred."  App. 133.

In Beckwith Machinery Co. v. Travelers Indem. Co., 815 F.2d 286 (3d Cir. 1987), we held that when an award of attorney fees is based on a contractual provision and is an "integral part of the contractual relief sought," the order does not become final and appealable until the attorney fees are quantified.  Id. at 287.  Accord Vargas v. Hudson County Bd. of Elections, 949 F.2d 665, 670 (3d Cir. 1991) (where attorney fees are sought as part of damages, and not as prevailing party, the rule of Budinich v. Becton Dickinson and Co., 486 U.S. 196 (1988), does not apply and the district court's ruling is not final until the

9

amount of fees is fixed); accord SPM Corp. v. M/V Ming Moon, 965 F.2d 1297, 1300 (3d Cir. 1992).

Because the attorney fees awarded in this case were part of the contractual damages sought by Local 542, the district court's delay in quantifying the amount of such fees until February 15, 1995 rendered the earlier order non-final for purposes of appeal.

This defect was not fatal to Hartford's appeal, however. Even though the March 2, 1994 order was not final when entered, it became final upon entry of the February 15, 1995 order fixing attorney fees and expenses at $19,881.73. We therefore exercise our jurisdiction pursuant to 28 U.S.C. § 1291 and the principle expressed in Cape May Greene, Inc. v. Warren, 698 F.2d 179, 184-85 (3d Cir. 1983), that this Court may entertain an appeal from a nonfinal order if an order which is final is subsequently entered before our adjudication on the merits.

## III.  Alter Ego

Hartford argues on appeal that the district court's alter ego determination is infected by clearly erroneous underlying factual findings, and that in any event the district court misapplied Pennsylvania law to the facts as found.

When considering a district court's state law alter ego determinations, we review the court's factual findings for clear error, but exercise plenary review over the legal conclusions it

draws from those facts.  Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 148-49 (3d Cir. 1988).

A.

After receiving evidence and taking testimony from Local 542 members Stanley Stracham and Edward Gilette, Tri-County's president Angela Scarantino, Hartford bond underwriter John Johnson and claims supervisor Dennis Powers, and Michael Ragan, administrator of the Funds, the district court found the following facts:

Tri-County has always maintained appropriate corporate formalities.  Both Mele and Tri-County are duly authorized Pennsylvania corporations.  Each filed articles of incorporation, held regular corporate meetings, kept their own corporate records, and took care not to intermingle funds.

Tri-County is owned by the three daughters of John Mele, Mele's president and majority shareholder.  The three Mele daughters, Angela Scarantino, Beverly Occulto, and Karen Darbenzio, each also own 11% of the shares of Mele.  The remainder of the stockholdings in Mele is in the name of John Mele (53%) and his wife, Catherine (14%).  The Mele corporation has filed in bankruptcy.  Angela Scarantino is the president of Tri-County, and Karen Darbenzio was an officer and shareholder of both Mele and Tri-County.

In addition to Tri-County, there are at least four other family-owned corporations in the Mele "group": Eleven-7 Corporation, owned by Stephen Scarantino and Bert Occulto,

11

husbands of Angela and Beverly, respectively; John Sal Inc., also owned by the three Mele daughters; Melback Corp., of which John Mele is the president, and West Mountain Sand Stone & Aggregates, Inc., of which Bert Occulto is the president.

Tri-County, which operates from a trailer leased from Eleven-7 corporation on land owned by John Sal, Inc., owned no equipment of its own. For the past twenty years, its sole function has been to supply operating engineers to Mele. Tri-County has undertaken no projects since Mele's demise.

Tri-County has never paid a dividend and was grossly undercapitalized for the work it had contracted to perform. As a result, it became insolvent shortly after Mele stopped payments on the Viewmont job.

The district court found that Angela Scarantino, Tri-County's president, had little knowledge of the day-to-day business affairs of Tri-County. Although the facts are disputed by Hartford, Scarantino was unable, for instance, to state whether Tri-County's financial statements were audited or un-audited, or whether Tri-County could make a claim against Mele under the Bond, or how Tri-County billed Mele for the Viewmont job.

The district court also found that Mele had treated Bert Occulto, Tri-County's project manager and husband of one of the three Mele daughters, as a Mele employee. More to the point, Mele enlisted him to participate in the negotiations between Mele and Hartford regarding the Bond.

12

Local 542 members solicited Tri-County jobs at Mele's offices. The court also found that John Mele had participated in Tri-County hiring, and greeted Stracham with the salutation, "glad to have you working for our company" when Stracham was seeking Tri-County employment. The district court concluded that the only contact Local 542 members had with Tri-County was that they were paid with Tri-County checks.

When Mele was negotiating the Bond with Hartford, Hartford requested and received from Tri-County and the other family-owned corporations indemnification for any payments Hartford would have to make on the Bond. The indemnity effectively precluded Tri-County itself from making a claim on the Bond. Moreover, it made Tri-County liable for all debts for labor and materials incurred by Mele on the Viewmont project, regardless of whether the debt was owed to Tri-County or another company. The district court described this agreement as a "financial albatross" which no "truly independent" corporation would assume. Dist. Ct. Op. 13.

The district court also observed that Mele had unilaterally proposed to subordinate its $75,000.00 debt to Tri-County to those of other creditors in its proposed plan of bankruptcy reorganization. Tri-County has not objected to the subordination, nor has it made a claim in the Mele bankruptcy.

Finally, the court found that Hartford itself considered Mele and Tri-County as one company. Dist. Ct. Op. 12. Hartford's internal correspondence referred to Tri-County as the

13

"union arm of Mele," and Hartford issued credit to Mele on the basis of composite Mele/Tri-County financial statements.

Hartford challenges a number of these factual findings as clear error, calling our attention to evidence which it contends the district court ignored, did not fully take into account, or evaluated incorrectly. See Hartford's Brief at pp. 19 et seq.. Hartford also emphasizes that corporate formalities were scrupulously maintained throughout Tri-County's 23 year existence, and that there is no evidence of commingling or siphoning of funds or transfers without adequate consideration. Under its separate name, Tri-County had been dealing amicably with Local 542 for over twenty years. Further, Hartford notes that the two testifying union employees who supposedly had no contact with Tri-County beyond receiving their paychecks listed Tri-County, not Mele, as their employer on their unemployment claim forms. Hartford also represented at oral argument that indemnities like the one given by Tri-County are commonplace in the construction industry.

We will not find clear error of fact unless a review of the record leaves us with the "definite and firm conviction that a mistake has been made." Anderson v. Bessemer City, 470 U.S. 564, 573 (1985). Although we are troubled by some aspects of the record, we are not persuaded by Hartford's argument. Our independent review of the record does not convince us that the district court was mistaken or committed clear error in its factual determinations.

14

The dissent, although acknowledging the findings made by the district court, assesses the evidence differently than did the district court, and also reads the record differently than do we. The dissent concludes that, in its opinion, the district court was mistaken in its findings. See Dissent Typescript at 4-5, 11-13.

Despite the position taken by the dissent, we are bound to defer to the district court's factfinding if evidence supports those findings. Under the clearly erroneous standard, a finding of fact may be reversed on appeal only "if it is completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data." Haines v. Liggett Group, Inc., 975 F.2d 81, 92 (3d Cir. 1992). When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings. Anderson, 470 U.S. at 575. Thus, an appellate court may not substitute its findings for that of the district court, but is limited to making an assessment of whether there is enough evidence on record to support such findings. Cooper v. Tard, 855 F.2d 125, 126 (3d Cir. 1988). Here, there is more than sufficient credible evidence to sustain each and every finding made by the district court.

The district court judge heard the witnesses, assessed their credibility, and, on the basis of the credible evidence, made detailed findings to which we are obliged to defer. Based on those historical findings, the district court found as ultimate facts that "the interrelationship between Mele and Tri-

15

County was such that Mele controlled Tri-County," Dist. Ct. Op. 11, and that Tri-County was "merely an extension of Mele and not a truly independent corporation . . . ." Dist. Ct. Op. 17. The district court consequently held, relying on the same legal authorities as does the dissent, that Tri-County was the alter ego of Mele.

These findings and this conclusion were reached after full recognition of the arguments on the evidence made by Hartford. Giving the appropriate deference to the district court's findings mandates a holding that no mistake has been committed. Anderson, 470 U.S. at 573.

True, if we, rather than the district court, were assigned the task of fact finding, we arguably might have found the facts differently. But we are not charged with that task, and we are satisfied that there being no clear error of fact, and, as we explain below, no legal error, the district court's factual findings and its legal conclusion of alter ego should be upheld.

B.

We also do not find that the district court committed legal error in holding Tri-County to be Mele's alter ego under Pennsylvania law. In Ashley v. Ashley, 393 A.2d 637 (Pa. 1978), the Pennsylvania Supreme Court set forth, in a formula familiar to the courts of that state, the following principles which are to be applied when a trial court disregards corporate forms and,

16

"piercing the corporate veil," holds that one individual or corporation is the alter ego of another:

> Th[e] legal fiction of a separate corporate entity was designed to serve convenience and justice . . . and will be disregarded whenever justice or public policy demand and where rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless. . . . We have said that whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate entity may properly be disregarded.

Id. at 641 (citations omitted). Pennsylvania courts have largely embraced the flexible tenor of the Ashley standard, holding, for instance, that no finding of fraud or illegality is required before the corporate veil may be pierced, but rather, that the corporate entity may be disregarded "whenever it is necessary to avoid injustice." Rinck v. Rinck, 526 A.2d 1221, 1223 (Pa.Super. 1987). Accord Lycoming County Nursing Home Ass'n, Inc. v. Com., Dept. of Labor and Industry, Prevailing Wage Appeal Bd., 627 A.2d 238, 243-44 (Pa.Cmwlth. 1993). We have said that Pennsylvania alter ego law requires a showing that the subordinate company "acted robot- or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons." Culbreth v. Amosa (Pty) Ltd., 898 F.2d 13, 15 (3d Cir. 1990).

Despite the nominally separate formal existence of Tri-County, the record to which we have referred supports the district court's findings and conclusion that Tri-County was Mele's alter ego. We emphasize, as did the district court, that Tri-County was willing, at the request of John Mele and Hartford,

17

to indemnify Hartford for <u>any obligations</u> of Mele which might trigger Hartford's liability under the Bond. This effectively merged the obligations of Tri-County and Mele, and prevented Tri-County from making any claim under the Bond. As a result, Tri-County has not done so, even though Mele is indebted to it for over $75,000.

Although it may be true that an indemnity agreement, standing alone, is insufficient to establish alter ego status, see <u>United States ex Rel. Global Bldg. Supply, Inc. v. WNH Ltd. Partnership</u>, 995 F.2d 515, 516-17 (4th Cir. 1993), this fact alone cannot blunt the impact of Tri-County's general willingness to sacrifice its own interests for those of Mele. This view is confirmed by Tri-County's failure to object to Mele's proposed plan in bankruptcy proceedings to subordinate Mele's debt to Tri-County to that of all other creditors.

We agree with the district court that the record reveals a family enterprise divided into formal "divisions" but nonetheless controlled by the same people -- John Mele and his family -- and that Mele employed Tri-County to Mele's own business ends. Tri-County relied entirely on Mele for its existence, both financially and operationally. In function, Tri-County was nothing more than the "personnel" arm of Mele. In light of the district court's findings of undercapitalization, non-functioning of independent officers, non-payment of dividends, Tri-County's consequent insolvency, and the subordination of Tri-County's financial interests to those of Mele, all of which survive clear error scrutiny, we are satisfied

18

that Local 542 met its burden under Pennsylvania law of showing that "[Mele] wholly ignored the separate status of [Tri-County] and so dominated and controlled its affairs that its separate existence was a mere sham." Wheeling-Pittsburgh Steel Corp. v. Intersteel, Inc., 758 F.Supp. 1054, 1057 (W.D.Pa. 1990); accord Lycoming County Nursing Home, 627 A.2d at 243-44.

C.

Hartford next argues that even if Tri-County and Mele are alter egos in the traditional sense, it was inequitable for the district court to hold Hartford liable to Local 542 under the Bond. Hartford argues, in essence, that as it is a "third party" guarantor of Tri-County's obligations to Local 542, Hartford's bond cannot be reached. We disagree.

This particular issue has arisen a number of times in connection with the Miller Act, 40 U.S.C. § 270a et seq., and Pennsylvania courts have relied upon these Miller Act decisions in determining whether to pierce the corporate veil in non-Miller Act payment bond cases. See Lezzer Cash & Carry, Inc. v. Aetna Ins. Co., 537 A.2d 857, appeal denied, 548 A.2d 256 (Pa.Super. 1988).

The Miller Act (the "Act") requires prime contractors on any construction contract with the United States exceeding $25,000 to execute a bond "for the protection of all persons supplying labor and materials." 40 U.S.C. § 270a(a)(2) (1986). The Act contains two important restrictions mirrored in many private payment bonds. First, Like Hartford's Bond, a Miller Act

19

bond's coverage is limited to "first-tier" subcontractors (such as Tri-County) and those who contract with them (such as Local 542). J.W. Bateson Co., Inc. v. United States ex rel. Board of Trustees of Nat. Automatic Sprinkler Industry Pension Fund, 434 U.S. 586, 594 (1978).

Second, § 270b(a) of the Act imposes a timely notice requirement essentially identical to that in Hartford's Bond, which requires those who contract with first-tier subcontractors, but not the first-tier subcontractors themselves, to give notice of their claims within 90 days after they last provided labor or materials.

These limitations have given rise to cases in which claimants on a payment bond seek to characterize the party with whom they contracted as the alter ego of a Miller Act contractor or subcontractor in order to avoid either the 90 day notice requirement or the coverage limitation of the Act. See, e.g., Continental Casualty Co. v. United States ex rel. Conroe Creosoting Co., 308 F.2d 846, 848 (5th Cir. 1962) (claim on Miller Act bond permitted by supplier of sub-subcontractor when sub-subcontractor was merely a "shadow" of the subcontractor); Glens Falls Ins. Co. v. Newton Lumber & Mfg. Co., 388 F.2d 66 (10th Cir. 1967), cert. denied, 390 U.S. 905 (1968) (when claimants had negotiated primarily with subcontractor but contracted with a sub-subcontractor, the sub-subcontractor, whose principal was a relative of the president of the contractor, was held to be a "sham" and surety was therefore liable to them on the bond); National Surety Corporation v. Unites States ex rel.

20

Way Panama, S.A., 378 F.2d 294, <u>cert.</u> <u>denied</u>, 389 U.S. 1004 (5th Cir. 1967) (90 day notice provision not binding on plaintiff when contractor and subcontractor "operated essentially as one entity"); <u>United States ex rel. Gilarde Environmental Management v. Federal Ins. Co.</u>, No. 89-1473, 1990 U.S. Dist. LEXIS 17929 (M.D.Pa. 1990) (same).⁰

The Fourth Circuit has held that Miller Act sureties may be reached "where ordinary principles of corporate law permit the courts to disregard corporate forms." <u>Global Building Supply, Inc. v. WNH Ltd. Partnership</u>, 995 F.2d 515, 519 (4th Cir. 1993). The findings that we have upheld, and the conclusion to which they lead, have obliged us to hold that Mele and Tri-County were alter egos under ordinary principles of Pennsylvania law. It follows that Hartford may be held liable on the bond and, despite Hartford's argument, we are satisfied that the equities do not suggest a contrary result.

---

⁰This Court has declined to pierce the corporate veil when there was "no evidence of familial ties or of any other facts" suggesting that the contractor and subcontractor had considered their own contractual relations to be other than "serious and enforceable obligations." <u>United States ex rel. K & M Corp. v. A & M Gregos, Inc.</u>, 607 F.2d 44, 48 (3d Cir. 1979). <u>Gregos</u>, which recognized the limitations on the right of remote sub-contractors to sue imposed by the Supreme Court's interpretation of the Miller Act in <u>J.W. Bateson Co., Inc. v. United States ex rel. Board of Trustees</u>, 434 U.S. 586 (1978), also turned on a lack of evidence that the contractor had been motivated to limit its liability on the bond. <u>Id.</u> Here, different findings regarding alter ego have been made. The district court found Mele and Tri-County to be just one company, with strong family ties and with clear indicia of domination and control. Moreover, it cannot be gainsaid that Hartford attempted to limit its liability on the Bond by seeking Tri-County's indemnification.

21

Further, Tri-County's indemnity obviated the very purpose of the notice provision, which is to remove the risk that the surety would end up "double-compensating" both subcontractors, such as Tri-County, and their suppliers, such as Local 542. See United States ex rel. Blue Circle West, Inc. v. Tuscon Mechanical Contracting Inc., 921 F.2d 911 (9th Cir. 1990). As the United States Supreme Court explained in J.W. Bateson Co., Inc. v. United States ex rel. Board of Trustees, 434 U.S. 586 (1978), bond notice provisions function much like a statute of repose, "permit[ting] [the surety], after waiting ninety days, safely to pay [the] subcontractors without fear of additional liability to sub-subcontractors. . .. The notice provision thus prevents both 'double payments' by [sureties] and the alternative of interminable delay in settlements between contractors and subcontractors." Id. at 590-91 n.4 (citations omitted). See also Lezzer, 537 A.2d at 862. Because Tri-County itself could make no claim against Hartford, this risk was absent from the outset.

After having treated Mele and Tri-County as essentially the same company, Hartford cannot now assert Tri-County's independence as a means of avoiding liability. The district court determined that the facts and the equities in this case required piercing the corporate veil and holding Mele to be Tri-County's alter ego. We agree.[0]

---

[0] The dissent claims that "[t]he relationship between Mele and Tri-County does not deprive Hartford of its status as an innocent third party." Dissent Typescript at 9. We are confident that our analysis, which relies on the Miller Act cases and which

22

IV.  ERISA Preemption

Hartford next contends that Local 542's action under the Bond is preempted by the Employees Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA").[0]  We must also reject this argument.

A

With several exceptions not relevant here, § 514(a) of ERISA, 29 U.S.C. § 1144(a), "preempts 'any and all State laws insofar as they may now or hereafter relate to any employee benefits plan' covered by the statute." Mackey v. Lanier Collection Agency & Service, Inc., 486 U.S. 825, 829 (1988) (quoting § 514(a)).

We recently stated that a rule of law "relates to" an ERISA plan "if it is specifically designed to affect employee benefits plans, if it singles out such plans for special treatment, or if the rights or restrictions it creates are predicated on the existence of such a plan."  United Wire, Metal and Machine Health and Welfare Fund v. Morristown Memorial Hospital, 995 F.2d 1179, 1192 (3d Cir.), cert. denied, __ U.S. __, 114 S.Ct. 382 (1993) (footnotes omitted).

---

leads to Hartford's liability, would be followed by Pennsylvania courts.

[0]We are not persuaded by Local 542's argument that Hartford failed to preserve its preemption claim for appeal because Hartford first raised the issue in its proposed findings of fact after all evidence had been adduced.  Accordingly, we address Hartford's preemption argument on the merits in text.

23

In addition, state causes of action which conflict with ERISA § 502(a) (ERISA's civil enforcement mechanism) are also preempted. Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54 (1987); see also Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 142 (1990).

Although neither party has briefed the issue, we assume that Local 542 is proceeding at common law as third-party beneficiary of the surety bond. See Philadelphia v. Smith Roofing, 599 A.2d 222, 229 (Pa.Super. 1991).

At the outset, it is clear that the cause of action relied upon by Local 542 is neither "specifically designed to affect employee benefits plans" nor "singles out" such plans for special treatment. United Wire, 995 F.2d at 1192. Rather, such common law causes of action are "generally applicable" laws that "make[] no reference to, [and] indeed function[] irrespective of, the existence of an ERISA plan." Ingersoll-Rand, 498 U.S. at 139.

Nor is the cause of action "predicated on the existence of" an ERISA plan. United Wire, 995 F.2d at 1192. In Ingersoll-Rand the Supreme Court held that ERISA preempted Texas' common law action against an employer for terminating an employee in order to avoid paying pension fund benefits. One of the two reasons given by the Court for why the Texas action was preempted was that "in order to prevail [in the cause of action], a plaintiff [must] plead, and the court [must] find, that an ERISA plan exists and the employer had a pension-defeating motive in terminating the employment." Id. at 140. Such a cause of action

24

"relates not merely to pension benefits, but to the essence of the pension plan itself." Id. (emphasis in the original). The Court concluded that "[b]ecause the court's inquiry must be directed to the plan, this judicially created cause of action 'relate[s] to' an ERISA plan." Id. No such inquiry is necessary in the present action.

Here, the district court need only determine Hartford's obligations under the Bond. It need make no inquiry into the validity or status of the funds (or indeed whether they are ERISA funds), nor need it explore Hartford's motives regarding employee benefits. The fact that the claimant under the bond happens to be an ERISA fund is not the kind of "critical factor in establishing liability" that prompted preemption in Ingersoll-Rand. Id. at 139-40.[0]

---

[0]For this reason, Hartford's reference to our decisions in Bricklayers and Allied Craftsmen International Union Local 33 Benefits Funds v. America's Marble Source, Inc., 950 F.2d 114 (3d Cir. 1991) and 1975 Salaried Retirement Plan v. Nobers, 968 F.2d 401 (3d Cir. 1992), cert. denied, __ U.S. __, 113 S.Ct. 1066 (1993) is inapposite. Bricklayers held that ERISA preempted the New Jersey Construction Workers' Fringe benefit Security Act, N.J.STAT.ANN. § 34:11A-1--34:11A-12, which imposed certain obligations on prime contractors and owners of construction projects to assure payments owed by subcontractors-employers to ERISA-regulated fringe benefit funds. The New Jersey statute challenged in Bricklayers was "specifically designed to affect employee benefit plans," Bricklayers, 950 F.2d at 118 (quoting Mackey v. Lanier Collection Agency & Serv., 486 U.S. 825, 829 (1988)), and, as such, was clearly within the preemption doctrine.

In Nobers, various plaintiffs brought a contract action seeking damages equivalent to what they would have received under an ERISA plan had they not been terminated under certain allegedly improper circumstances. This Court determined, following Ingersoll-Rand, that the action was preempted because it "depend[ed] on the existence of an ERISA plan" and "if there were no plan, there would have been no cause of action." Nobers,

25

Our recent decision in <u>Haberern v. Kaupp Vascual Surgeons Pension Plan</u>, 24 F.3d 1491, 1497 (3d Cir. 1994) is instructive on this point. Ms. Haberern's employer made contributions to her pension plan based on the size of her salary excluding bonus. By re-characterizing a portion of her compensation as a "bonus," the employer effectively reduced the amount it paid into her pension plan. Ms. Haberern claimed that this constituted a violation of ERISA. The defendant argued that Ms. Haberern's status as an at-will employee under Pennsylvania law allowed it to change her compensation at any time. Ms. Haberern responded that ERISA preempted Pennsylvania law on at-will employment in this regard. On appeal, we held that Pennsylvania's common law presumption of at-will employment relationships was not preempted by ERISA because the presumption was "unrelated to the existence <u>vel non</u> of any pension plan." <u>Id.</u> at 1497. The very same may be said of Local 542's cause of action. Simply because the sums collected may ultimately feed into an ERISA-governed fund does not in itself mean that the cause sued upon creates rights or restrictions which are "predicated on" the existence of an ERISA plan.[0]

---

968 F.2d at 406. We find <u>Nobers</u> to be distinguishable. The state contract action challenged in <u>Nobers</u> was predicated on the existence of benefits allegedly available to certain employees <u>under</u> the ERISA plans. Thus, <u>Nobers</u> would have required "a plaintiff [to] plead, and the district court [to] find, that an ERISA plan exists" and that the plaintiffs would have been entitled to benefits under the plan, the very exercise which prompted preemption in <u>Ingersoll-Rand</u>, 998 U.S. at 140. We need undertake no such exercise here.

[0] Indeed, it should not be overlooked that the damages sought by Local 542 and ordered to be paid by Hartford include not just benefit funds, but union dues as well.

Nor is the cause of action asserted here subject to what we have termed "conflict preemption" under ERISA. See PAS v. Travelers Insurance Company 7 F.3d 349, 356 (3d Cir. 1993). ERISA's civil enforcement remedies were meant to be exclusive. Pilot Life, 481 U.S. at 51. Thus, even a common law cause of action is preempted by ERISA if it conflicts directly with an ERISA cause of action. See Ingersoll-Rand, 498 U.S. at 142.

Together, ERISA §§ 502 and 515 (29 U.S.C. §§ 1132 and 1145, respectively) "provide a cause of action and remedies for an employer's failure to fulfill its obligations to make pension or welfare fund contributions pursuant to a plan or collective bargaining agreement." Bricklayers and Allied Craftsmen International Union Local 33 Benefits Funds v. America's Marble Source, Inc., 950 F.2d 114, 117 (3d Cir. 1991) (emphasis added).

Section 3 of ERISA, 29 U.S.C. § 1002(5), defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan." Courts that have considered the matter have all but unanimously held that sureties do not fall within this definition. See, e.g., Carpenters So. Cal. Admin. Corp. v. D & L Camp Construction Co., Inc., 738 F.2d 999, 1000 (9th Cir. 1984) (legislative history of ERISA revealed no Congressional intent to "expand the concept of employer . . . to include

sureties, whose obligations are fixed by contract and regulated by state law for the protection of the public").

The Eleventh Circuit has emphasized that sureties who are not signatories to the collective bargaining agreement between the employer and the claimants do not fall within the ERISA definition of "employer," stating as follows:

> The phrase, "in the interests of the employer" is the operative one here. The surety does not act indirectly in the interests of the employer, but rather acts directly in the interests of employees damaged by the employer's failure to pay.

Xaros v. U.S. Fidelity and Guarantee Co., 820 F.2d 1176, 1180 (11th Cir. 1987); cf. Laborers Local 938 Joint Health & Welfare Trust Fund v. B.R. Starnes Co., 827 F.2d 1454, 1457 (11th Cir. 1987); Giardiello v. Balboa Ins. Co., 837 F.2d 1566 (11th Cir. 1988). But see Greenblatt v. Delta Plumbing & Heating Corp., 818 F.Supp. 623, 629 (S.D.N.Y. 1993) (rejecting the reasoning of the Eleventh and Ninth Circuits and holding that a surety qualified as an employer under ERISA).

We agree with the Ninth and Eleventh Circuits that a surety does not act "in the interest of an employer." Although it is true that the surety's services are often purchased by the employer in order that it may proceed with its business, the ultimate beneficiaries of that contract are the claimants on the bond. The surety does not stand in an employer relationship to the claimants, nor is it the agent of the employer. Thus, Hartford, which is neither the employer of Local 542's operating

28

engineers nor acting "in the interests of" their employer, cannot claim ERISA preemption.

## V. Damages

Hartford's final argument on appeal concerns the extent of its liability under the Bond. The district court awarded Local 542 a total of $126,224.11, including $78,794.79 in unpaid contributions, $5,719.11 in union dues and $42,190.21 in liquidated damages, all derived from the provisions of the CBA (Collective Bargaining Agreement) less $480.00 in prepayment.[0] The court also awarded reasonable attorney fees and costs of $19,881.73 according to the terms of the PFA (Pension Fund Agreement).[0] Hartford contends that under Pennsylvania law its obligations do not extend to payment of liquidated damages and

---

[0] Article VI of the Collective Bargaining Agreement requires the employer (Tri-County) to make timely fringe benefit contributions to the Funds of "26.6% of wages" divided up among the various funds, as well as a Union Check-Off equalling 3.2% of wages. Section seven of Article VI provides for a surcharge of 20% per annum or 2% above prime rate, whichever is higher, on certain late contributions. App. 25.

[0] Article VIII, section 1 of the pension fund trust agreement between the union and the employer provides that:

> The Board of Trustees . . . shall have the right . . . to institute and prosecute . . . any proceeding at law . . . against any Employer . . . to collect unpaid contributions which may be or become due under this Agreement . . .. Such Employer shall pay <u>all costs and reasonable attorney's fees incurred by the Board of Trustees in connection with any such litigation.</u>

App. 133 (emphasis added)

attorney fees in the absence of a specific bond provision to the contrary. We agree.

Pennsylvania law, at least as announced by that State's intermediate courts, limits a surety's obligations to those detailed in the bond itself, Reliance Universal, Inc. v. Ernest Renda Contracting Co., Inc., 454 A.2d 39, 45 (Pa.Super. 1982), and not those contained in the agreement between the contractor and the claimant. J.C. Snavely & Sons, Inc. v. Web M & E, Inc., 594 A.2d 333, 336 (Pa.Super. 1991). Local 542's claims against Hartford are predicated, at least in part, on Tri-County's obligations to it under the CBA and the PFA. Because the Bond makes no reference to liquidated damages or attorney fees, Hartford has disavowed any responsibility for these items.

Hartford's bond provides as follows:
> [Hartford agrees] that every claimant . . .
> who has not been paid in full before the
> expiration of a period of ninety (90) days
> after the date on which the last of such
> claimant's work or labor was done or
> performed . . . may sue on this bond for
> . . . such sum or sums as may be justly due
> claimant. . ..

App. 97. Hartford is thus obliged to render to Local 542 all sums which Local 542 is "justly due" for labor. The district court reasoned that as Local 542 members would not be "paid in full" for their labor until all of Tri-County's obligations under the CBA and PFA (including liquidated damages and attorney fees) had been satisfied, Hartford must be liable for these items. Although the parties have pointed us to no decisions of the

30

Pennsylvania Supreme Court treating the issues presented here, we believe that the law of Pennsylvania is otherwise.

As previously noted, the bond is silent as to attorney fees and liquidated damages, and it is the language of the bond that is controlling under Pennsylvania law. Thus, the central question necessarily becomes: What obligations are "sums justly due" for labor? One answer is that the surety's obligations to the claimant are co-extensive with those of the employer. But this is simply to say that Hartford's obligations are fully determined by the agreements between Tri-County and Local 542. As already noted, this has been expressly (and recently) rejected by Pennsylvania's lower courts. Such decisions are persuasive precedent, National Surety Corp. v. Midland Bank, 551 F.2d 21, 29 (3d Cir. 1977), and are "not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." West v. American Telephone & Telegraph Co., 311 U.S. 223, 237 (1940).[0]

---

[0] The district court considered the Supreme Court's interpretation of the Miller Act in United States for the Benefit of Sherman, et al. v. Carter, et al., 353 U.S. 210 (1957) to be just such "persuasive data." The Miller Act requires contractors on public works projects to post a bond covering the "sum or sums justly due" suppliers of material and labor. See 40 U.S.C. § 270a(a)(2). Carter held that "sums justly due" under the Miller Act included not only delinquent contributions to fringe benefits funds, but also liquidated damages and attorney fees.

We are not convinced that Carter is apposite in the present case. First, the Miller Act imposes policy-driven statutory obligations on the principal and surety which are not implicated here. Second, this Court implicitly rejected this view in Knecht, Inc. v. United Pacific Insurance Company, 860 F.2d 74 (3d Cir. 1988), which concluded that under Pennsylvania law attorney fees are not "sums justly due" under a payment bond. Id. at 80-81. Further, in Carter the parties had expressly

31

Nevertheless, it is clear that what Local 542 is "justly due" turns at least in part on what Tri-County promised Local 542. And this will inevitably be determined by reference to the agreements between them. Indeed, Hartford does not contest that Local 542 is "justly due" the fringe benefit contributions and union dues which are specified in detail in the CBA. The question thus becomes what of Tri-County's obligations to Local 542 are "sums justly due" for labor.

In regard to attorney fees, we have already held that they are not "sums justly due." In doing so, we rejected an argument very much like that proffered by Local 542 and accepted by the district court. In Knecht, Inc. v. United Pacific Insurance Company, 860 F.2d 74 (3d Cir. 1988), a supplier brought suit on a surety bond covering "sums justly due," seeking, inter alia, attorney fees. We stated as follows:

> The district judge noted that unless the [attorney] fees were paid, [the claimant] would not be made whole. This undoubtedly is correct but the judge's holding proved too much, as it is always true that when a plaintiff must make expenditures for attorney's fees to recover a debt it will not be made whole unless its fees are also recovered. Further, whenever a person is indebted to another the sum owed may be regarded as justly due. . . . In fact, we can hardly conceive of how a bond could be written to authorize a claimant to sue for

_____

stipulated that liquidated damages and attorney fees were compensation for labor. 353 U.S. at 220. Finally, whether Carter can stand for the broader proposition that such sums are always "justly due" must be questioned in the aftermath of F. D. Rich Co., Inc. v. United States, 417 U.S. 116 (1974), which held that an award of attorney fees under the Miller Act would in ordinary circumstances be an inappropriate abrogation of the American rule. Id. at 130-31.

32

> anything less than a sum justly due.  We also
> observe that in some contracts express
> provision is made for recovery of attorney's
> fees in the event of an action for breach.
> Yet in [the bond] no reference was made to
> attorney's fees.  In the circumstances, we
> conclude that attorney's fees are not
> recoverable in this action.

Id. at 80-81.  Since Knecht, the Pennsylvania Superior Court has
held that attorney fees are not sums "justly due."  Snavely, 594
A.2d at 334-37.  As we are unable to discern a meaningful
difference between the present action and the cause of action
asserted in Knecht, we are constrained to reverse the district
court's award of attorney fees.

We must similarly reverse the district court's award of
"liquidated damages," a sum which the CBA refers to as a
"penalty" to be assessed against Tri-County in the event of late
payment of the fringe benefit contributions.[0]  On at least three
occasions Pennsylvania courts (or courts applying Pennsylvania
law) have rejected the liability of a surety for default
obligations which add some percentage accretion to the underlying
debt.  See Reliance Universal, Inc. of Ohio v. Ernest Renda

---

[0]Section seven of Article VI of the CBA, entitled "Penalty
Clause," provides as follows:

> All Fringe Benefits Funds.  [P]ayments are
> due . . . not later than the 25th of the
> month . . ..  In the event [of a delinquency
> continuing until] the 15th of the next
> succeeding month, there will be due . . . a
> penalty in the amount of twenty percent (20%)
> per annum or 2% above the prime rate,
> whichever is higher, of the original
> contributions which will be assessed until
> the delinquency . . . [is] resolved.

App. 25.

Contracting Co., 454 A.2d 39, 44-46 (Pa.Super. 1982) (surety on bond covering cost of "all labor and material used" not liable for a 1 1/2% "service charge" for late accounts provided for in contract between contractor and supplier because not part of the "cost" of labor and materials); Lite-Air Products, Inc. v. Fidelity & Deposit Co. of Maryland, 437 F.Supp. 801, 804 (E.D.Pa. 1977) (surety on bond covering "amount due the claimant for such labor or material" not liable for "finance charges" on late payments for materials because such charges are more akin to penalties or damages than they are related to the value of the materials); J.C. Snavely & Sons, 594 A.2d at 335-37 (surety on bond covering "sums as may be justly due" not liable for attorney fees and finance charges accrued under agreement between claimant and contractor because not detailed in the payment bond).  See also Salvino Steel & Iron Works, Inc. v. Fletcher & Sons, Inc., 580 A.2d 853, 856 (Pa.Super. 1990) (surety on bond covering payment to those who have "furnished material or performed or supplied labor" not liable for delay damages attributable to contractor because not within the express language of the bond).[0]

These cases reveal a clear reluctance on the part of Pennsylvania courts to expand the liability of a surety beyond the base or essential obligations of the contractor.  Indeed, in Lite-Air the court declined to hold a surety liable for "finance charges" for delinquent payments as they were in the nature of a

_____

[0]The district court distinguished many of the above-cited cases on the ground that they involved suppliers of material, not labor.  We are not persuaded by this distinction.

34

penalty -- and "penalty" is precisely how the "liquidated damages" are described in the CBA.  In the absence of an express provision in the Bond, we conclude that such additional contractual "charges," "fees" or "penalties" cannot be considered "sums justly due" and hence are not recoverable from a surety under Pennsylvania law.  Accordingly, we will reverse the district court on this ground as well.

VI.

Having considered the record and the arguments of the parties, we will affirm the district court's March 2, 1994 and February 15, 1995 orders insofar as they entered judgment on Count IV against Hartford and in favor of Local 542 for unpaid contributions and union dues, less prepayments.

We will, however, reverse the district court's orders insofar as they grant liquidated damages and attorney fees to Local 542, and we will remand to the district court with directions that the March 2, 1994 order and the February 15, 1995 judgment be modified to delete all amounts awarded to Local 542 for liquidated damages and attorney fees, consistent with the foregoing opinion.

Ragan v. Tri-County Excavating, Inc. et al.

Nos. 94-1388 & 95-1189

HUTCHINSON, J., Dissenting.

35

I respectfully dissent from the Court's decision to affirm the district court's March 2, 1994 order. In my view, the district court erred as a matter of law in piercing the corporate veil. This case does not involve exceptional circumstances, nor demand the use of this extraordinary remedy to impose liability on Hartford, an independent third-party surety. Moreover, the district court's factual findings leave me with a definite and firm conviction that a mistake was committed. In my opinion, the Court embraces, contrary to applicable Pennsylvania law, an overly broad view of the doctrine that permits a court to pierce the corporate veil in extraordinary cases to prevent fraud or injustice. In addition, I believe the Court's holding is likely to unsettle the reasonable expectations of parties who secure bonds for the payment of materialmen and suppliers (as well as others) in construction projects and reduce competition in the industry.[0]

Local 542 concedes that it did not give Hartford ninety days notice of its claims in accord with the bond terms. Pennsylvania law requires compliance with this type of notice provision as a condition precedent to recovery on a payment bond. See Lezzer Cash & Carry, Inc. v. Aetna Ins. Co., 537 A.2d 857, 865 (Pa. Super.) ("The notice provision at issue here stated specifically that written notice within the ninety day period was a condition precedent to Aetna's liability on the bond. We are

---

[0] I agree with the Court that Pennsylvania law, not ERISA, governs this case. I also concur with the Court's conclusion that Hartford could not be liable for counsel fees or liquidated damages.

obliged to enforce the terms of the agreement."), appeal denied,

548 A.2d 256 (Pa. 1988).  Therefore, Local 542 cannot recover

against Hartford unless it can prevail under an alter ego theory.

Pennsylvania law is unclear as to whether the finding

of alter ego is a question of fact or law.  I am not insensitive

to this Court's statement, applying federal law, that "[a]

finding of an alter ego situation is a factual one and must be

supported by the record."[0]  Carpenters Health & Welfare Fund v.

Kenneth R. Ambrose, Inc., 727 F.2d 279, 283 (3d Cir. 1983)

(citation omitted).  More recently, however, we stated:

> Assuming that Pennsylvania will permit
> recovery on an alter-ego theory on a showing
> of injustice, as opposed to fraud or deceit
> (a point not yet decided by the Pennsylvania
> Supreme Court), it is nevertheless plain that
> Pennsylvania, like New Jersey, does not allow
> recovery unless the party seeking to pierce
> the corporate veil on an alter-ego theory
> establishes that the controlling corporation
> wholly ignored the separate status of the
> controlled corporation and so dominated and
> controlled its affairs that its separate
> existence was a mere sham.  See In re Penn
> Cent. Sec. Litig., 335 F. Supp. 1026, 1035
> (E.D. Pa. 1971); Ashley v. Ashley, 482 Pa.
> 228, 236-238, 393 A.2d 637, 641 (1978).  In
> other words, both Pennsylvania and New Jersey
> require a threshold showing that the
> controlled corporation acted robot- or
> puppet-like in mechanical response to the
> controller's tugs on its strings or pressure
> on its buttons.

Culbreth v. Amosa Ltd., 898 F.2d 13, 14-15 (3d Cir. 1990) (per

curiam); see also Craig v. Lake Asbestos of Quebec, Ltd., 843

---

[0]This statement, arguably dictum, can be read as standing for no
more than the obvious proposition that every legal conclusion
must have factual support.

37

F.2d 145, 150 (3d Cir. 1988). The Culbreth standard has been followed by several district courts. See Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa., Inc., 848 F. Supp 569, 580 (E.D. Pa. 1994); May v. Club Med Sales, Inc., 832 F. Supp. 937, 938-39 (E.D. Pa. 1993); Stinson v. GAF Corp., 757 F. Supp. 644, 645-46 (W.D. Pa. 1990). This suggests to me that the alter ego determination involves elements of law as well as fact.

In any event, the treatment of two companies as alter egos is "an extraordinary remedy preserved for cases involving exceptional circumstances." Village at Camelback Property Owners Ass'n, Inc. v. Carr, 538 A.2d 528, 533 (Pa. Super. 1988), aff'd per curiam, 572 A.2d 1 (Pa. 1990); see also First Realvest, Inc. v. Avery Builders, Inc., 600 A.2d 601, 604 (Pa. Super. 1991) (characterizing the alter ego remedy as "extreme"); Connors v. Peles, 724 F. Supp. 1538, 1559 (W.D. Pa. 1989) ("The decision of a court to pierce the corporate veil . . . is to be exercised reluctantly and cautiously."). A party attempting to negate the separate existence of a corporate entity has the burden of presenting "clear, direct, precise and believable evidence that the corporate veil should be pierced." Iron Worker's Sav. & Loan Ass'n v. IWS, Inc., 622 A.2d 367, 376 (Pa. Super. 1993); see also First Realvest, 600 A.2d at 604 (party failed to state sufficient facts to support alter ego theory); Carpenters Health, 727 F.2d at 284 (burden of proof rests on party attempting to pierce the corporate veil).

Pennsylvania law considers a variety of factors to determine whether one corporation is the alter ego of another.

38

They include the ignoring of corporate formalities, gross undercapitalization, a lack of corporate records, non-functioning officers and directors, non-arms-length transactions between the corporations, and especially domination and day-to-day control sufficient to deprive the alter ego of its corporate identity. See Village at Camelback, 538 A.2d at 533; see also Carpenters Health, 727 F.2d at 284; United States v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981). Before concluding a corporation is the alter ego of another, the trial court must be able to conclude, based upon the record, that justice or public policy demands the use of such an extraordinary remedy, that the rights of innocent parties will not be prejudiced, and that the theory of the corporate entity will not be rendered useless. Lezzer Cash & Carry, 537 A.2d at 861 (quoting Ashley, 393 A.2d at 641). Absent extraordinary or unusual circumstances, a court should recognize and maintain the separate corporate identity. First Realvest, 600 A.2d at 604; Reverse Vending Assoc. v. Tomra Systems US, Inc., 655 F. Supp. 1122, 1128 (E.D. Pa. 1987).

In determining whether Tri-County was Mele's alter ego, the district court expressly found that Tri-County consistently complied with all corporate formalities. Despite this finding, however, it then went on to conclude that the two corporations were alter egos. It found: (1) Tri-County only worked on Mele projects; (2) Tri-County was grossly undercapitalized; (3) Hartford treated Tri-County and Mele as one company; (4) Tri-County's president, who was the daughter of Mele's owner, lacked knowledge of the company's business; (5) Mele assisted in hiring

39

Tri-County employees; (6) Tri-County had never paid dividends; (7) Tri-County's employees only contact with Tri-County was its name on their paychecks; (8) the two companies' employees were interchanged; and (9) Mele proposed to subordinate all of its debt to Tri-County in bankruptcy proceedings without Tri-County's knowledge or authorization. Ragan v. Tri-County Excavating, Inc., No. 92-0066, slip op. at 4-7, 15 (E.D. Pa. March 2, 1994).

I believe the district court's findings are insufficient to support an alter ego theory. Put simply, Local 542 failed to meet its threshold burden of showing that Mele "wholly ignored the separate status of [Tri-County] and so dominated and controlled its affairs that its separate existence was a mere sham." Culbreth, 898 F.2d at 14. Nor did Local 542 show that Tri-County "acted robot- or puppet-like in mechanical response to [Mele's] tugs on its strings or pressure on its buttons." Id. at 15. In my opinion, the present circumstances are not so "exceptional" or "unusual" as to warrant extension of this extraordinary remedy to force Hartford to pay debts it did not agree to cover. See Village at Camelback, 538 A.2d at 533; First Realvest, 600 A.2d at 604; Lezzer Cash & Carry, 537 A.2d at 861.

I also believe the Court's statement that "no finding of fraud or illegality is required before the corporate veil may be pierced, but rather, that the corporate entity may be disregarded 'whenever it is necessary to avoid injustice,'" Majority Op. at 16 (quoting Rinck v. Rinck, 526 A.2d 1221, 1223 (Pa. Super. 1987)), is an incorrect statement of Pennsylvania

40

law. The Court in Culbreth did assume that Pennsylvania would pierce the corporate veil upon a showing of injustice but, nevertheless, concluded that a party had to make a threshold showing that the subordinate company was completely controlled and dominated or "acted robot- or puppet-like." Culbreth, 898 F.2d at 14-15. I do not think Local 542 has so shown. Neither Rinck nor Culbreth involved an attempt to impose liability on a third-party through the third-party's dealings with an alter ego. Though an "injustice" standard is more flexible than a standard of "fraud," nevertheless, when the corporate veil is pierced under either standard, the knife is usually pointed at the shareholder who stands behind the veil, not those who contract with the shareholder's alter ego.

In reaching its conclusion, I believe the district court was improperly induced to make Hartford a full participant in the activities of Mele and Tri-County by its fixation on the fact that Local 542 was attempting to recover money for pension and other benefit plans. During the hearing, for instance, the district court stated that "nothing is more sacred today in this country than a pension plan because it's been ignored by too many people and that's important." Appellant's Appendix ("App.") at 585. It also stated that "[t]o preclude recovery on their claim would have a serious impact on their pensions and health and other benefits." Ragan, No. 92-0066, slip op. at 16. Though workers' pension rights are important, I think the district court's decision placed too much emphasis on the persons in whose

41

behalf Local 542 sued.  The pension problem should have been left to ERISA, which we all agree does not apply here.[0]

In addition to finding exceptional circumstances where none exist, I believe the district court committed legal error by utilizing the alter ego theory to impose liability on an innocent third-party (Hartford).  Ordinarily, courts apply the alter ego theory to impose liability upon a shareholder who manipulates its so-called alter ego.  These cases present issues of corporate governance.  The district court, however, made no distinction between the issue of corporate governance and the issue of contract and surety law, which controls this case.  Instead, it simply treated this matter as one involving the alter ego doctrine and then used that doctrine to change the text of a contract between Hartford and Mele.  It allowed Local 542 to pierce the corporate veil and impose liability on Hartford, a third-party contracting with Mele in the ordinary course of its business as a surety, rather than on Mele, the manipulative corporate shareholder who is responsible for the injustice, if any, that may be present here.

In doing so, it failed adequately to consider Pennsyvlania's general rule against piercing the corporate veil to the prejudice of innocent parties.  See Ashley, 393 A.2d at 641; Lezzer Cash & Carry, 537 A.2d at 861.  In Lezzer Cash &

---

[0]The ERISA issues seem to have dropped out of the case when Tri-County conceded its liability for the pension payments due Local 542.

<u>Carry</u>, the Superior Court of Pennsylvania addressed a fact pattern similar to this one.  It stated:

> [T]here is no need to pierce the corporate veil in order to avoid injustice.  As to the corporate enterprises of SGA [principal and general contractor] and Oreland [subcontractor], whatever their relationship may be, both Aetna [surety] and Lezzer [materialman] are not involved.  On the contrary, both are innocent parties.  Aetna issued a payment bond as requested by SGA and included therein terms which were satisfactory to SGA, the principal, and PHP, the obligee.  Lezzer entered a contract to sell materials to Independence [sub-subcontractor], with whom it had been doing business on prior occasions.  It did so with knowledge of or the ability to learn the terms of the payment bond which had been issued by Aetna.  As between Aetna and Lezzer, both innocent parties, there was no reason to pierce the corporate veils of SGA and Oreland in order to alter the terms of the bond which Aetna had agreed to write to protect designated subcontractors and materialmen.

<u>Lezzer Cash & Carry</u>, 537 A.2d at 861.

In determining that Hartford was not innocent because it "considered Mele and Tri-County as one company," <u>Ragan</u>, No. 92-0066, slip op. at 12, 16, the district court relied upon Tri-County's indemnity agreement, an internal memorandum from Hartford that referred to Tri-County as part of Mele, and Hartford's review of Tri-County's financial statements.  In my view, this is insufficient to support a finding that Hartford was not an innocent third-party.  <u>See</u> James E. McFadden, Inc. v. Baltimore Contractors, Inc., 609 F. Supp. 1102 (E.D. Pa. 1985) (inter-office memoranda largely irrelevant to alter ego issue);

43

_Global Building Supply, Inc. v. WNH Ltd. Partnership_, 995 F.2d 515 (4th Cir. 1993) (name association insufficient to find one company is alter ego of other).  As with the surety in _Lezzer Cash & Carry_, Hartford issued a payment bond containing terms agreeable to Mele, not Local 542.  The relationship between Mele and Tri-County does not deprive Hartford of its status as an innocent third-party.

In this respect, I recognize Pennsylvania's tendency to look to federal cases interpreting the Miller Act as persuasive authority, and I have no quarrel with the principle that "sureties may be reached 'where ordinary principles of corporate law permit the courts to disregard corporate forms.'"  Majority Op. at 21 (quoting _Global Building Supply, Inc._, 995 F.2d at 519).  However, in Pennsylvania, "ordinary principles of corporate law" seem to me to preclude use of alter ego doctrine to impose liability on innocent third-parties.  See _Ashley_, 393 A.2d at 641; _Lezzer Cash & Carry_, 537 A.2d at 861.  In particular, I do not find persuasive those Miller Act cases that pre-date _Ashley_ and _Lezzer Cash & Carry_.  See _Global Building Supply_, 995 F.2d at 519 (describing pre-_Bateson_ cases as "arguably" more prove to excuse non-compliance with a bond's notice provision than those that came after _Bateson_).

Additionally, I am unable to accept the Court's conclusion that Hartford (as a third-party surety) can be compelled to pay because the party "in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests. . . ."  Majority Op. at 16

44

(quoting Ashley, 393 A.2d at 641). Such a general statement strikes me as obiter dictum. At best, it is a truism. At worst, if taken seriously, it would permit courts to ignore the fiction of separate corporate existence at will. That fiction is one of proven utility and, in my judgment, essential to the functioning of a modern free market industrial society.

Finally, I believe the district court not only erred as a matter of law, but that its ultimate finding that Mele and Tri-County were alter egos is clearly erroneous. Put somewhat differently, viewing the record as a whole leads me to a "definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985) (internal quote omitted).

Specifically, Tri-County followed all corporate formalities and maintained a legitimate set of corporate records. Although Mele may have participated in Tri-County's management, there is no clear indication that John Mele or his corporation dominated and controlled Tri-County to such an extent that it was a facade or a sham. See McFadden, 609 F. Supp. at 1105 (mere participation in management is insufficient). Further, neither John Mele nor his corporation owned any stock in Tri-County; nor can the court attribute a financial interest to John Mele and the Mele corporation simply because his three daughters were Tri-County's sole shareholders. Related family corporations often have common stockholders.

The fact the district court seemed to rely upon most strongly was the indemnity agreement Hartford demanded from Tri-

45

County and the Mele family's other corporations. The record indicates, though, that Tri-County and its owners reasonably thought they would benefit financially if Mele obtained bonding and performed the project. Thus, I conclude the indemnity agreement is insufficient to justify the conclusion that Tri-County was Mele's alter ego.

The district court also relied on testimony that some of Tri-County's employees were interviewed and hired at Mele's offices. The record, however, also shows that these interviews were done by a Tri-County employee, who made the decision to hire. Moreover, the testimony to the effect that it was common knowledge that Tri-County and Mele were the same company can just as easily be taken as showing that Local 542 dealt with Tri-County with its eyes open. See Lezzer Cash & Carry, 537 A.2d at 861. The fact that a Tri-County employee attended a meeting with Hartford concerning the surety bond does not appear unusual to me as Hartford was asking Tri-County to indemnify it.

I recognize, of course, that Tri-County's president's responses to the district court could indicate that she lacked any detailed knowledge of Tri-County's operations. The district court used these responses to conclude that the president was a mere figurehead. Many times, however, her answers merely indicated confusion over the nature of the question and the district court's manner in asking it.

The district court believed that Tri-County's ignorance of Mele's proposal to subordinate Tri-County's debt in its bankruptcy proceeding was significant. I fail to see how a

46

"unilateral" offer by Mele to subordinate its debt to Tri-County, without Tri-County's knowledge, is evidence of Tri-County's participation in abuse of the corporate form warranting application of the alter ego doctrine.

The district court's conclusion that Tri-County only worked on projects with Mele is not borne out by the record. The district court's belief that Tri-County was grossly undercapitalized ignores the economic reality that it had operated successfully for twenty-three years. So, too, Tri-County's failure to pay dividends strikes me as nothing unusual for family corporations whose owners are acquainted with our income tax laws.

On the other hand, the undisputed fact that there was no commingling of funds and Tri-County was not recently incorporated indicate, along with their observance of corporate formalities, that the separate corporate existence of Mele and Tri-County should not be ignored. Taking all these facts together, I am unable to conclude that Local 542 produced evidence that is clear, precise and convincing enough to warrant piercing the corporate veil.

Accordingly, I would reverse the district court's judgment in all respects.

47