

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-16-2007

# DL Resources Inc v. FirstEnergy

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-1855

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"DL Resources Inc v. FirstEnergy" (2007). *2007 Decisions.* Paper 309.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/309

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

<u>PRECEDENTIAL</u>

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-1855
_____

DL RESOURCES, INC.

v.

FIRSTENERGY SOLUTIONS CORP.,

Appellant.
_____

On Appeal from the District Court
for the Western District of Pennsylvania
(D.C. Civil No. 03-cv-00200)
District Judge: Hon. Gary L. Lancaster
Argued January 23, 2007

Before:  SCIRICA, <u>Chief Judge</u>, FUENTES, and CHAGARES,
<u>Circuit</u> <u>Judges</u>


_____

(Filed: October 16, 2007)


<u>Counsel for Appellant</u>

Richard W. Hosking, Esq. (Argued)
Gerard J. Schirato, Esq.
Melissa J. Tea, Esq.
Kilpatrick & Lockhart Nicholson Graham LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222

<u>Counsel for Appellee</u>

Thomas T. Frampton, Esq. (Argued)
Mandi L. Scott, Esq.
Stacy F. Vernallis, Esq.
Goehring, Rutter & Boehm
1424 Frick Building
437 Grant Street
Pittsburgh, PA 15219


OPINION OF THE COURT

CHAGARES, <u>Circuit</u> <u>Judge</u>.

This dispute arises out of a contract for the purchase of natural gas. When the seller, appellee DL Resources, Inc. (DL Resources), was unable to supply the volume of natural gas to the buyer, appellant FirstEnergy Solutions Corporation (FirstEnergy), to which FirstEnergy believed it was contractually entitled, FirstEnergy withheld payments to DL Resources to offset the costs it incurred by having to purchase natural gas on the open market at higher prices than it would have paid pursuant to the parties' contract. FirstEnergy also informed a potential customer of DL Resources, Mid-American, that it might get involved in litigation with Mid-American if Mid-American entered a contract with DL Resources for natural gas because FirstEnergy believed that, by virtue of its agreement with DL Resources, it was contractually entitled to the gas Mid-American was contemplating purchasing from DL Resources. Mid-American promptly ended its negotiations with DL Resources.

Thereafter, DL Resources initiated this litigation, asserting both contract and tort-based claims against FirstEnergy. The parties filed cross-motions for summary judgment, and the District Court granted summary judgment to DL Resources on several claims. In this appeal, we conclude that the District Court properly granted summary judgment to DL Resources on its contract-based claims. As to DL Resources' claim for prospective advantage/tortious interference with a future contractual relationship, however, we hold that the District Court erred in granting summary judgment *sua sponte* without notice. Accordingly, we will affirm in part and vacate in part the District

Court's decision, and remand for further proceedings consistent with this opinion.

I.

DL Resources finds, extracts, and markets oil and natural gas in western Pennsylvania. Prior to and during 2002, DL Resources acquired leases and/or interests in natural gas deposits in McKean County, Pennsylvania, and began drilling to recover the gas. By May 2002, DL Resources had begun extracting and marketing natural gas from eighty-six wells in McKean County.

On May 15, 2002, DL Resources and FirstEnergy entered into a contract for the sale of natural gas. Under this contract, known as the "Base Gas Purchase Agreement," DL Resources agreed to sell FirstEnergy a supply of natural gas from its gas wells in McKean County. The output from these wells was less than the parties anticipated, and as a result, FirstEnergy had to purchase natural gas on the open market to compensate for this production shortfall. Because the open market price was higher than the price FirstEnergy would have paid for an equivalent amount of natural gas under the parties' contract, FirstEnergy reasoned that it was entitled under the contract to withhold monies from the payments it owed DL Resources to offset these higher procurement costs.

In the summer or fall of 2002, FirstEnergy learned that Mid-American, a potential purchaser of natural gas, was engaged in negotiations with DL Resources to obtain natural gas. Prior to the execution of this contract, and while negotiations between DL Resources and Mid-American were ongoing, Eric Wright, an agent and employee of FirstEnergy, informed Mark Williams, Vice-President of Gas at Mid-American, that FirstEnergy believed it had a contractual right to the output DL Resources was attempting to sell to Mid-American. Wright also informed Williams that FirstEnergy might get involved in litigation with Mid-American if it consummated its deal with DL Resources. Shortly thereafter, Mid-American ended its negotiations with DL Resources.

On February 10, 2003, DL Resources filed the lawsuit underlying this appeal in federal district court. DL Resources' amended complaint alleged the following causes of action:

3

declaratory judgment (Count I), breach of contract (Count II), unjust enrichment (Count III), tortious interference with a contractual relationship (Count V), and prospective advantage/tortious interference with a future contractual relationship (Count VI).[1] Counts I-III resulted from FirstEnergy's withholding of monies to offset procurement costs it incurred in having to purchase natural gas on the open market, while Counts V and VI pertained to FirstEnergy's interference with DL Resources' dealings with Mid-American.

DL Resources and FirstEnergy filed cross-motions for summary judgment. FirstEnergy moved for summary judgment on all claims, while DL Resources moved only for summary judgment on its breach of contract and declaratory judgment claims (Counts I and II). By a memorandum opinion and order entered February 9, 2005, the District Court granted summary judgment in DL Resources' favor with respect to Counts I, II, III, and VI, and granted summary judgment in FirstEnergy's favor with respect to Count V.[2] The District Court did not, however, calculate the damages to which DL Resources would be entitled with respect to any claim. Notwithstanding this failure, the District Court entered a final judgment order on February 11, 2005, and marked the case closed.

On February 18, 2005, DL Resources filed a motion to amend the judgment pursuant to Fed. R. Civ. P. 54(c) and 59(e), asking the District Court to specify the monetary damages to which DL Resources was entitled as a result of FirstEnergy's breach of

---

[1]The amended complaint also alleged intentional misrepresentation (Count IV), but that count was later withdrawn.

[2]DL Resources did not appeal the District Court's grant of summary judgment to FirstEnergy regarding Count V (DL Resources' claim for tortious interference with a contractual relationship). Accordingly, that aspect of the District Court's decision is not before us. Unless otherwise noted, all references to DL Resources' claim for tortious interference pertain exclusively to Count VI (alleging prospective advantage/tortious interference with a future contractual relationship).

4

the parties' contract and its tortious interference with DL Resources' prospective relationship with Mid-American. On March 11, 2005, while DL Resources' motion to amend the judgment was still pending, FirstEnergy filed a notice of appeal from the District Court's order entered February 11, 2005.

The parties stipulated that DL Resources was entitled to damages in the amount of $2,473,005.35 on its breach of contract claim, which included interest calculated at 6% through November 21, 2005. However, the parties were not able to agree regarding the amount of damages to which DL Resources would be entitled on its tortious interference claim. To determine these damages, the District Court held a bench trial on November 21, 2005. The District Court issued an opinion and an amended judgment order on December 19, 2005 awarding DL Resources $2,384,267.03 on its tortious interference claim in addition to the agreed-upon damages of $2,473,005.35 for breach of contract, for a total damage award of approximately $4.85 million. FirstEnergy did not file a new or amended notice of appeal.

## II.

Our analysis must begin with DL Resources' contention that FirstEnergy failed to file a timely notice of appeal. The question whether FirstEnergy's notice of appeal was timely is a question of law over which we exercise plenary review. Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 585-87 (3d Cir. 1999).

We have appellate jurisdiction only to hear appeals from final judgments of the district courts and other matters not relevant here. See 28 U.S.C. § 1291. FirstEnergy filed its notice of appeal on March 11, 2005 from the District Court's order entered February 11, 2005. This order determined FirstEnergy's liability but did not fix damages. DL Resources argues that FirstEnergy failed to perfect its appeal because at the time FirstEnergy filed its notice of appeal on March 11, 2005, the District Court's decision was not final for purposes of appellate review. We have recognized that "[a] finding of liability that does not also specify damages is not a final decision." Marshak v. Treadwell, 240 F.3d 184, 190 (3d Cir. 2001) (citing Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. 737, 744 (1976)); see Gen. Motors Corp. v. New A.C.

5

Chevrolet, Inc., 263 F.3d 296, 311 n.3 (3d Cir. 2001) ("In general terms, a decision that fixes the parties' liability but leaves damages unspecified is not final, and the adjudication of liability is not immediately appealable."). Accordingly, DL Resources is correct that the order expressly appealed from did not constitute a final and appealable order. This does not end this initial inquiry, however. We must consider whether FirstEnergy's premature notice of appeal "ripened" as a result of events following its filing.

Federal Rule of Appellate Procedure 4(a)(2) provides "[a] notice of appeal filed after the court announces a decision or order -- but before the entry of the judgment or order -- is treated as filed on the date of and after the entry." The Supreme Court has noted "Rule 4(a)(2) permits a notice of appeal from a nonfinal decision to operate as a notice of appeal from the final judgment only when a district court announces a decision that *would* be appealable if immediately followed by the entry of judgment." FirsTier Mortg. Co. v. Investors Mortg. Ins. Co., 498 U.S. 269, 276 (1991). This rule is plainly inapplicable insofar as FirstEnergy appealed from an order that had been entered and was not final.

After FirstEnergy filed its notice of appeal, DL Resources filed a motion to amend the judgment pursuant to Fed. R. Civ. P. 54(c) and 59(e), seeking to have the District Court specify the monetary damages to which it was entitled. Following a stipulation fixing a portion of the damages and a bench trial to determine the remainder of the damages, the District Court awarded DL Resources a total damage award of approximately $4.85 million via an amended judgment order entered on December 19, 2005. Because FirstEnergy failed to renew or amend its notice of appeal following the District Court's entry of its amended judgment order, DL Resources argues that FirstEnergy failed to perfect its appeal, thus depriving us of jurisdiction over this appeal.[3]

---

[3]It remains an open question whether Rule 4 of the Federal Rules of Appellate Procedure limits our subject matter jurisdiction, or whether it is merely a judicially-imposed "inflexible claim processing rule" that sets out guidelines which, if fractured, will typically cause us to decline to exercise our jurisdiction. See United States v. Carelock, 459 F.3d 437, 440 n.6 (3d Cir. 2006).

6

Although some of our case law clearly views Rule 4 as jurisdictional, see, e.g., Poole v. Family. Ct. of New Castle County, 368 F.3d 263, 264 (3d Cir. 2004) ("The timeliness of an appeal is a mandatory jurisdictional prerequisite."); Ragan v. Tri-County Excavating, Inc., 62 F.3d 501, 505 (3d Cir. 1995) (implicitly assuming that Rule 4 is jurisdictional, and *sua sponte* raising concern that we lacked authority to decide the appeal in light of party's failure to comply with Rule 4),  recent Supreme Court decisions cast doubt on the validity of this view.  In Eberhart v. United States, 546 U.S. 12, 126 S. Ct. 403 (2005) (per curiam), the Supreme Court held that Rule 33 of the Federal Rules of Criminal Procedure was not jurisdictional, but instead is an "inflexible claim-processing rule."  Id. at 404 (quotation marks omitted). Similarly, in Kontrick v. Ryan, 540 U.S. 443, 456 (2004), the Supreme Court held that Rules 4004 and 9006 of the Federal Rules of Bankruptcy Procedure were "claim-processing rules," rejecting the argument they were jurisdictional.  But cf. Carelock, 459 F.3d at 440 n.6 (suggesting in dicta, post-Kontrick and Eberhart, that "the language and commentary of the rules, along with their prior treatment by the Supreme Court and this Court, strongly support the conclusion that Rules 3 and 4 [of the Federal Rules of Appellate Procedure] govern subject-matter jurisdiction").

The Supreme Court's decision last term in Bowles v. Russell, 127 S. Ct. 2360 (2007), similarly leaves this question open.  In Bowles, the Supreme Court determined that the time for filing a notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a)(6) was jurisdictional and therefore not subject to waiver or judicial modification.  Central to this determination was that the limitations in Rule 4(a)(6) "carrie[d] into practice [28 U.S.C. § 2107(c)]," which itself expressly limited district courts' ability to extend the time for filing a notice of appeal.  See id. at 2366 ("Because Congress specifically limited the amount of time by which district courts can extend the notice-of-appeal period in [§ 2107(c)], that limitation is more than a simple claim-processing rule.  As we have long held, when an appeal has not been prosecuted in the manner directed, within the time limited by the acts of Congress, it must be dismissed for want of jurisdiction. Bowles' failure to file his notice of appeal in accordance with the statute therefore deprived the Court of Appeals of jurisdiction.

7

Federal Rule of Appellate Procedure 4, <u>inter</u> <u>alia</u>, grapples with the effect that certain post-judgment motions have on a notice of appeal.  Rule 4(a)(4)(A) states, in pertinent part:

> If a party timely files in the district court any of the following motions under the Federal Rules of Civil Procedure, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:
>
> ***
>
> (iv) to alter or amend the judgment under Rule 59 .
> . . .

Rule 4(a)(4)(B) discusses the proper procedure when a party files a notice of appeal while a Rule 59 motion (or motion pursuant to another rule listed in Rule 4(a)(4)(A)) is still pending.  Rule 4(a)(4)(B)(ii) states:

---

And because Bowles' error is one of jurisdictional magnitude, he cannot rely on forfeiture or waiver to excuse his lack of compliance with the statute's time limitations.") (quotation marks and citations omitted).  By contrast, Congress imposed no such analogous limitation on appeals governed by Rule 4(a)(4)(B); accordingly, <u>Bowles</u> does not control the jurisdictional question presented in this case.

Following <u>Kontrick</u> and <u>Eberhart</u> (but prior to <u>Bowles</u>), at least one court has construed Rule 4(a)(4)(A)(vi) to be a mere claim-processing rule.  <u>See</u> <u>Wilburn v. Robinson</u>, 480 F.3d 1140, 1145-46 (D.C. Cir. 2007) (rejecting argument that a specific provision of Rule 4 is jurisdictional).  It is unnecessary for us to reach or decide whether the provision of Rule 4 in issue here is jurisdictional, because it is undisputed that DL Resources raised a timely objection to FirstEnergy's appeal.  In other words, even assuming that Rule 4(a)(4)(B)(ii) is a mere claim-processing rule -- and therefore subject to waiver if not raised -- DL Resources preserved the issue.

8

> A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment altered or amended upon such a motion, must file a notice of appeal, ***or an amended notice of appeal*** -- in compliance with Rule 3(c) -- within the time prescribed by this Rule measured ***from the entry of the order disposing of the last such remaining motion***.

Fed. R. Civ. P. 4(a)(4)(B)(ii) (emphasis added). Insofar as FirstEnergy failed to renew or amend its notice of appeal following the District Court's entry of its amended judgment order on DL Resources' Rule 59 motion, Rule 4(a)(4)(B)(ii) does not aid FirstEnergy's argument that jurisdiction exists.

FirstEnergy essentially ignores the text of Rule 4(a)(4)(B)(ii), and instead relies heavily on a line of our cases beginning with Cape May Greene, Inc. v. Warren, 698 F.2d 179 (3d Cir. 1983). The so-called Cape May Greene doctrine dictates that, absent a showing of prejudice not present (or even alleged) here, "a premature notice of appeal, filed after disposition of some of the claims before a district court, but before entry of final judgment, will ripen upon the court's disposal of the remaining claims." Lazy Oil, 166 F.3d at 585 (citing Cape May Greene, 698 F.2d at 184-85). This doctrine clearly represents an "expansive view of appellate jurisdiction." ADAPT of Phila. v. Phila. Housing Auth., 433 F.3d 353, 362 (3d Cir. 2006). Notwithstanding the tension between our interpretation of Rule 4 and the text of the rule, we have justified our interpretation based upon the view that Rule 4 does not exclusively govern every "situation in which a premature notice of appeal will ripen at a later date." Lazy Oil, 166 F.3d at 587.[4] The Court is bound by our prior interpretation

---

[4]Several other circuits have either declined to adopt or repudiated the sort of ripening analysis we first sanctioned in Cape May Greene. See, e.g., Outlaw v. Airtech Air Conditioning & Heating, Inc., 412 F.3d 156, 160 n.2 (D.C. Cir. 2005) (Roberts, J.) (rejecting the interpretation of Rule 4(a)(4) we articulated in Lazy Oil, and observing that "[t]he fact that there is a rule governing pre-judgment premature notices of appeal and another rule

regarding the scope and effect of Rule 4 unless and until we revisit that determination en banc. See Mariana v. Fisher, 338 F.3d 189, 201 (3d Cir. 2003) ("'[N]o subsequent panel overrules the holding in a precedential opinion of a previous panel. Court en banc consideration is required to do so.'") (quoting Third Circuit Internal Operating Procedure 9.1).

We applied the Cape May Greene doctrine in somewhat analogous circumstances in Ragan. 62 F.3d at 505-06. There, the appellant filed a notice of appeal after the District Court determined liability against it, but before it fixed damages. The District Court later entered an order awarding damages. This Court, in examining whether it had jurisdiction, determined that the order appealed from was not a final order for purposes of appeal. Id. at 505. Nonetheless, the Court found that "[t]his defect was not fatal to [appellant's] appeal." Id. The Court acknowledged the Cape May Greene doctrine, explaining that "this Court may entertain an appeal from a nonfinal order if an order which is final is subsequently entered before our adjudication on the merits." Id. at 506. Applying the Cape May Greene doctrine, the Court held "[e]ven though the [liability] order was not final when entered, it became final upon entry of the [] order fixing [damages]." Id. at 505-06. As a result, the Court found it had jurisdiction under 28 U.S.C. § 1291. Id. at 506.

We hold that FirstEnergy's premature notice of appeal ripened on December 19, 2005, when the District Court entered the

---

governing post-judgment premature notices of appeal hardly means that courts are at liberty to fashion additional doctrines saving premature notices of appeal that are not saved under the rules, as construed by the Supreme Court"); United States v. Cooper, 135 F.3d 960, 963 (5th Cir. 1998) (repudiating its prior "expansive view of appellate jurisdiction" regarding premature notices of appeal); United States v. Hansen, 795 F.2d 35, 37, 38 (7th Cir. 1986) (expressly rejecting Cape May Greene doctrine); Gen. Television Arts, Inc. v. Southern Ry., 725 F.2d 1327, 1330-31 (11th Cir. 1984) ("[A] final judgment does not retroactively validate the premature notice of appeal.") (quotation marks omitted).

amended judgment order quantifying the damage award. We also hold that we have jurisdiction to hear FirstEnergy's appeal under 28 U.S.C. § 1291.

III.

On the merits, we exercise plenary review over the District Court's grant of summary judgment. Summary judgment is appropriate if there are no genuine issues of material fact presented and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). We resolve all factual doubts and draw all reasonable inferences in favor of FirstEnergy, the nonmoving party. Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005), cert. denied, 126 S. Ct. 1065 (2006).

As this is a diversity case, we must apply the choice of law principles of Pennsylvania, the forum state, to determine what law governs this dispute. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); On Air Entertainment Corp. v. Nat'l Indem. Co., 210 F.3d 146, 149 (3d Cir. 2000). Accordingly, using Pennsylvania choice of law rules, we must determine which state law applies to the causes of action in issue here. With respect to the contract-based claims, the parties' contract contains a choice of law provision specifying that the contract shall be interpreted according to Ohio law. Moreover, the parties agree that Ohio law governs the contractual claims in issue. We see no reason to depart from the general rule that choice of law provisions shall be honored. See Nationwide Mut. Ins. Co. v. West, 807 A.2d 916, 920 (Pa. Super. Ct. 2002) ("In contract disputes, Pennsylvania courts generally honor the parties' choice of law provisions."), and will therefore apply Ohio law to the parties' contract based-claims.[5]

A.

---

[5]Although this case contains both contract and tort-based causes of action, each of which requires a separate choice of law analysis, our decision renders it unnecessary for us to determine what law governs DL Resources' tort-based claim.

11

Under Ohio law, the construction of a written contract is a matter of law that we review de novo. Saunders v. Mortensen, 801 N.E.2d 452, 454 (Ohio 2004). The role of a court is to give effect to the intent of the parties to the agreement. To accomplish this, we must examine the contract as a whole and presume that the intent of the parties is reflected in the language used in the policy. Westfield Ins. Co. v. Galatis, 797 N.E.2d 1256, 1261 (Ohio 2003). We look to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy. When the language of a written contract is clear, a court may look no further than the writing itself to determine the intent of the parties. Id.

However, "where a contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent." Id. Contractual ambiguities will be construed against the drafter. Id. at 1262. A court, nonetheless, may not "alter a lawful contract by imputing an intent contrary to that expressed." Id. at 1261-62. Under Ohio law, then, analysis properly begins with an examination of the relevant contractual language. If the contract language is unambiguous, then the analysis ends there.

Although both parties agree that the contract is unambiguous, they nonetheless disagree sharply regarding the nature of their contract. For its part, DL Resources maintains that, by its plain terms, the parties' contract is an output contract which calls for DL Resources to supply FirstEnergy with all of the natural gas produced at each of the eighty-six wells in issue, subject to certain minor exceptions not at issue here. By contrast, FirstEnergy apparently[6] argues that the parties' contract is a

_____

[6]We say apparently because FirstEnergy makes conflicting statements in its brief regarding its conception of the parties' contract. At certain points, FirstEnergy suggests that the parties reached an output contract with a volume minimum, while at other points it intimates that the parties reached a purely volume-based agreement. Compare FirstEnergy Br. at 9-10 (stating that parties reached an output contract with a volume minimum) with FirstEnergy Br. at 20 ("[B]ecause the Agreement required the delivery of fixed minimum volumes, the identity of the wells to be

12

volume contract that required DL Resources to supply a minimum daily volume of natural gas to FirstEnergy, and specified the per unit price that FirstEnergy would be obligated to pay at various output levels above that minimum. In essence, then, FirstEnergy argues that the parties entered an output contract with a volume minimum.

It is undisputed (i) that DL Resources sold FirstEnergy all the natural gas produced by the eighty-six wells at all relevant points in time; and (ii) that this output was substantially less than what the parties had anticipated the wells would generate, and, at some points in time, less than the minimum volumes FirstEnergy maintains DL Resources was contractually obligated to provide. Because the parties agree that DL Resources furnished FirstEnergy all of the natural gas produced by the wells in issue, summary judgment is appropriate on the parties' contract-based claims if we determine that the parties did in fact enter a purely output contract. Therefore, how we characterize the parties' contract is central to our resolution of the contract-based claims in issue.

For several reasons, it is clear that the parties' agreement is purely an output contract that calls for DL Resources to supply to FirstEnergy all of the output produced by the eighty-six Pennsylvania natural gas wells in which DL Resources had an interest in May 2002, the time when the contract was formed. To begin with, the contract makes clear in several places that the parties entered an output-based contract, not a volume-based one. The contract states in pertinent part that:

listed on Exhibit A-1 is irrelevant. In other words, DL Resources had an obligation to deliver a specific volume of gas to FirstEnergy, regardless of the origin of that gas."); FirstEnergy Br. at 10 ("Despite the reference to wells listed on Exhibit A-1, Exhibit A-1 was blank. From FirstEnergy's standpoint, this made sense: because it was purchasing a minimum fixed quantity of gas at fixed prices, it did not matter from which wells that gas came.") (quotation marks and citations omitted). In any event, for the reasons stated *infra*, this confusion is ultimately immaterial, as the contract is clear on its face that it is purely an output agreement (with no minimum volume).

13

> 1. <u>AGREEMENT</u>. Subject to the terms and conditions herein contained, [FirstEnergy] shall buy the gas delivered to it by [DL Resources] at the Delivery Point(s). ***[DL Resources] shall deliver and sell to Buyer all the gas owned, produced or purchased by [DL Resources] from the Wells***, excepting only such quantity as [DL Resources] may require for drilling or pumping operations on said premises and such quantity as may be reserved to the landowners by their oil and gas leases.

Appendix (App.) 31 (emphasis added). This provision mentions nothing about a volume minimum. Short of labeling the contract as an "output contract," it is hard to imagine how the parties could have been any more clear regarding the nature of their agreement.

The contractual provision about the price of the natural gas also indicates that the parties reached an output contract. In this regard, the contract states that:

> 5. <u>PRICE</u>. ***[FirstEnergy] shall pay [DL Resources] for all gas delivered and measured at the Delivery Point(s).*** The price to be paid by [FirstEnergy] to [DL Resources] for gas delivered to [FirstEnergy] at the Delivery Point(s) shall be identified on Exhibit "B-" attached to and made a part of this Agreement . . . .

App. 32 (emphasis added). The express requirement that FirstEnergy pay for "all gas delivered" further indicates that the parties reached an output contract without a volume minimum.

The preamble to the contract further supports this interpretation. The preamble to the contract states as follows:

> WHEREAS, ***[DL Resources] has developed a supply of natural gas ("gas") from gas wells enumerated and described on Exhibit "A-"*** attached hereto, and which may be amended from time to time by mutual agreement between the parties; and

14

WHEREAS, [DL Resources] is the owner of such gas or is the authorized agent for the owner or owners of such gas and therefore has the authority to contract for the sale of such gas; and

WHEREAS, *[DL Resources] desires to sell and agrees to sell*, for itself and those owners for which it is the authorized selling agent, and to deliver to [FirstEnergy], at the Delivery Point(s) hereinafter specified, *natural gas produced from the well or wells described on Exhibit "A-"*, hereinafter referred to as "the Wells"; and

WHEREAS, *[FirstEnergy] is willing to purchase from [DL Resources] the gas produced from the wells* [sic] at the rates and subject to the terms, conditions, and limitations herein provided.

App. 31 (emphasis added).

Insofar as FirstEnergy argues that the contract calls for delivery of a fixed volume only (as opposed to an output contract with a volume minimum), this cannot be squared with the preamble to the contract, which only makes sense if the contract was output-based. Indeed, if FirstEnergy is correct, and the parties' agreement is a volume contract rather than an output contract, it is not at all clear what purpose the preamble would serve, as it would not matter where DL Resources procured the natural gas that it was contractually obligated to sell to FirstEnergy; all that would matter is that DL Resources obtained the requisite amount of natural gas. Cf. FirstEnergy Br. at 20 ("[B]ecause the Agreement required the delivery of fixed minimum volumes, the identity of the wells to be listed on Exhibit A-1 is irrelevant."). Moreover, under this interpretation, the preamble is all the more bizarre when one considers that FirstEnergy -- not DL Resources -- drafted the contract.[7] Thus, FirstEnergy would have us believe that it included

_____

[7]At oral argument, counsel for FirstEnergy maintained that DL Resources -- not FirstEnergy -- drafted Exhibit B-1 to the parties' contract. At no point, however, did FirstEnergy dispute

15

language in the contract that was not merely irrelevant (as it now contends), but that affirmatively supports an interpretation that FirstEnergy claims it never intended. We can think of no reason (nor does FirstEnergy offer any) sufficient to explain why we should adopt such a strained interpretation of the parties' contract.

The sole evidence FirstEnergy offers in support of its claim that the parties reached a minimum volume arrangement is an addendum to the contract titled Exhibit B-1. To understand the significance of this addendum, it is both necessary and appropriate to consider it in the context of the contract as a whole. The original contract states that the parties will specify the price per unit of natural gas in an addendum. In keeping with this agreement, the parties crafted Exhibit B-1, which states in pertinent part as follows:

DELIVERY
PERIOD:             06/01/02 - 03/31/04

VOLUME:             5,000 Dth/Day @ $3.04     J u n e
                                             2002 thru
                                             M a r c h
2004
                    30,000 Dth/Month @
                    $3.565                    N o v .
                                             2002 thru
                                             Oct. 2003

                    Balance @ NYMEX
                    + $0.105                  J u n e
                                             2002 thru
                                             M a r c h
                                             2004

Less any gathering charges.

*(100% of the production from wells*

---

that it alone drafted the remainder of the contract, including the preamble.

16

***listed on Exhibit A-1)***

RECEIPT POINT:   NFGS

App. 38 (emphasis added).[8]

Based on Exhibit B-1, FirstEnergy argues that the pricing chart shows the parties intended that DL Resources would supply a minimum of 5,000 dekatherms of natural gas per day, and that any additional output above that minimum level would be purchased according to the pricing structures established by the parties.  FirstEnergy is only half right.  Exhibit B-1 does set out graduated pricing structures at various levels of output, but it does not set any sort of a per-day volume floor.  From June 2002 to March 2004, the addendum established one price for daily volumes of natural gas up to 5,000 dekatherms, and a second price for any level of daily output above 5,000 dekatherms.  The parties modified this pricing schedule somewhat for the time period between November 2002 and October 2003.  For this period, there would be one price for monthly volumes of natural gas up to 30,000 dekatherms, and a second price for any level of monthly output above 30,000 dekatherms.

Moreover, as stated previously, paragraph five of the parties' contract explicitly contemplated the execution of an "Exhibit B" to establish the per dekatherm price of natural gas.  It is simply not plausible that, by adding this anticipated Exhibit B -- which was called for by a provision of the contract titled "PRICE" -- the parties intended to overhaul their arrangement on ***volume***.  Such a reading would override the contract's numerous references

---

[8]In its opinion, the District Court mistakenly transcribed Exhibit B-1, omitting the section header "Volume" and rearranging some of the information listed therein.  Compare App. 13 (District Court's transcription of Exhibit B-1) with App. 38 (actual copy of Exhibit B-1).  While FirstEnergy makes much of this error, see FirstEnergy Br. at 18-19, it is ultimately immaterial, as no portion of the District Court's opinion hinged on this error.  Moreover, the plenary scope of our review ensures that FirstEnergy will suffer no prejudice as a result of this mix-up.

to an output-based agreement *sub silencio*, which would be particularly questionable given that Exhibit B-1 itself explicitly reaffirms FirstEnergy's obligation to purchase "100% of the production from the wells listed on Exhibit A-1." See id. Viewed in the context of the contract as a whole, we cannot agree that Exhibit B-1 required DL Resources to provide a minimum daily volume of natural gas. Rather, the plain terms of the contract make clear that the parties entered an output arrangement. Because it is undisputed that DL Resources furnished FirstEnergy all of the output by the wells governed by this contract, the District Court properly granted DL Resources' motion for summary judgment on its contract-based claims.

## B.

Quite apart from whether the parties' contract is ambiguous, FirstEnergy argues that the District Court committed several errors that merit reversal of its grant of summary judgment on the contract-based claims. First, FirstEnergy maintains that the District Court was unjustified in assuming that the wells to which the contract refers were the eighty-six wells in western Pennsylvania in existence at the time the parties reached their contract. In this regard, the parties' contract states that the natural gas in issue would be drawn from wells the parties would specify in Exhibit A-1. As the District Court noted, however, the parties failed to specify any wells in Exhibit A-1. The District Court determined that this oversight was inadvertent, and determined that the parties intended to list the eighty-six Pennsylvania wells developed at the time the contract was executed in May 2002. While FirstEnergy argues that the District Court's determination was improper, it is not clear why. Nowhere in its briefs does FirstEnergy actually dispute that the parties intended to list the eighty-six wells (and only those wells) on Exhibit A-1.[9] The parties' failure to list these

---

[9]Moreover, under FirstEnergy's interpretation of the contract, it is difficult to see why this finding would be material, given FirstEnergy's position that the contract called for DL Resources to produce a fixed amount of natural gas. Indeed, FirstEnergy candidly admits that it views this finding as immaterial. See FirstEnergy Br. at 10 ("Despite the reference to

18

wells therefore presents no impediment to summary judgment.

FirstEnergy's second argument is that the District Court's conclusion that Exhibit B-1 was a fee schedule rather than a minimum volume commitment cannot be reconciled with certain provisions of the contract, namely the provision titled "Trigger Rights." This provision states in pertinent part that:

> [DL Resources] *may*, at any time prior to Noon on the day of the applicable NYMEX Contract closing day, notify an authorized representative of [FirstEnergy] by telephone to trigger the NYMEX futures price currently traded for that month on a specified volume (Contract Trigger Volume). Contract Trigger Volume shall be defined as any portion (in 10,000 Dth increments) of the volumes which [DL Resources] is obligated to deliver *during any forward month*. Upon [FirstEnergy's] execution of said Contract Trigger(s), [FirstEnergy] will send a confirmation notice to [DL Resources] outlining the price, volume and delivery month for each Contract Trigger transaction. If [DL Resources] delivers less than One Hundred (100) Percent of the Contract Trigger Volumes in a given month, and the Contract Trigger Price is lower than the NYMEX Contract Settlement Price for that month, [DL Resources] shall be assessed a Market Differential Cost (Contract Trigger Price minus NYMEX Contract Settlement Price) on the unutilized Contract Trigger Volumes. If [DL Resources] elects not to trigger a price prior to the time as specified above, the price shall default to the

wells listed on Exhibit A-1, Exhibit A-1 was blank. From FirstEnergy's standpoint, this made sense: because it was purchasing a minimum fixed quantity of gas at fixed prices, it did not matter from which wells that gas came.") (quotation marks and citations omitted); FirstEnergy Br. at 20 ("[B]ecause the Agreement required the delivery of fixed minimum volumes, the identity of the wells to be listed on Exhibit A-1 is irrelevant.").

basis settlement agreement as stated in Exhibit B-1.

App. 32 (emphasis added).[10]

Essentially, then, this provision gives DL Resources the option to fix -- or, to use the language of the contract, "trigger" -- an obligation to deliver a set volume of gas at a set price. In other words, this provision permits (but does not require) DL Resources to convert its commitment for a given month from an output contract to a fixed-volume contract. This provision further provides that if DL Resources exercised this option to convert its obligation to a fixed volume agreement but failed to deliver to FirstEnergy the volume of natural gas it promised, and if FirstEnergy had to purchase the balance of the promised volume on the open market at a higher price, FirstEnergy would be entitled to recoup the incremental costs it incurred as a result of DL Resources' failure to deliver the promised volume. Given the non-mandatory nature of this provision, we cannot say that it is inconsistent with the District Court's interpretation of the parties' agreement as an output contract.

There is the further question whether DL Resources ever exercised this triggering option. While DL Resources argues that it never did so, FirstEnergy argues that DL Resources did so on two occasions. Specifically, FirstEnergy notes (i) that on January 16, 2001, DL Resources triggered an obligation to supply 5,000 decatherms per day for June 1, 2002 until March 31, 2004 at the price of $3.04 per decatherm; and (ii) that on March 11, 2002, DL Resources again exercised its option to lock in a monthly volume of 30,000 decatherms for the period between November 1, 2002 and October 31, 2003 at a price of $3.565 per decatherm. But even assuming (as we must, given the procedural posture of this case)

---

[10]This provision also lends further support to the notion that Exhibit B-1 established the pricing component -- not volume -- of the parties' arrangement. See App. 32 (noting that if DL Resources "elects not to trigger a price prior to the time as specified above, the price shall default to the basis settlement agreement as stated in Exhibit B-1").

20

the validity of both of these triggering agreements, both agreements preceded the parties' execution of the contract in May 2002, and are therefore barred by the parol evidence rule. <u>Galmish v. Cicchini</u>, 734 N.E.2d 782, 788 (Ohio 2000) ("The parol evidence rule states that absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements.") (quotation marks omitted). And, by its own terms, it is clear that the contract represented the "final written integration" of the parties' dealings.[11] Because there is no evidence that DL Resources exercised this option at any point *after* the parties' execution of the contract, we find unpersuasive FirstEnergy's argument based on the "Trigger Rights" provision of the contract.

Third, FirstEnergy argues that the District Court's interpretation renders the contract's "force majeure" provision superfluous. <u>See</u> App. 34, ¶ 17 (immunizing both parties from liability for failure to perform due to acts of God or other events beyond the parties' control). The force majeure provision is not applicable in this context, FirstEnergy argues, because DL Resources is obliged only to supply its output, nothing more. Thus, if DL Resources' production had been hampered or even extinguished for a period of time, it would have had no contractual liability to FirstEnergy as long as it furnished FirstEnergy with whatever output it did produce, even if that output were nothing. To begin with, FirstEnergy cites no authority whatsoever for the

---

[11]The contract's integration clause reads as follows:

<u>Entire Agreement</u>. This Agreement sets forth all understandings between the parties respecting the subject matter of this transaction and all prior agreements, understandings, and representations, whether superceded by this Agreement. No modification or amendment of the Agreement shall be binding on either party unless in writing and agreed to by both parties . . . .

App. 36.

proposition that force majeure provisions are superfluous in output contracts. This absence of authority is unsurprising, as FirstEnergy's argument rests on the mistaken assumption that, at least from a supplier's perspective, there is no reason to have a force majeure provision when the parties have entered into a output contract. In fact, there are valid reasons why DL Resources might have desired the force majeure provision notwithstanding the fact that the parties entered an output contract. For instance, DL Resources may have wanted to protect itself from liability if it triggered a fixed volume obligation pursuant to the contract, but was then unable to deliver to FirstEnergy the required volume due to an event contemplated by the force majeure provision. Accordingly, we are unpersuaded that the District Court's interpretation of the contract renders the force majeure provision irrelevant. Thus, FirstEnergy's objections do not, either individually or collectively, convince us that the District Court erred by granting summary judgment to DL Resources on its contract-based claims.[12]

## C.

We turn to the District Court's grant of summary judgment as to DL Resources' claim for tortious interference with a prospective contractual relationship. As noted previously, DL Resources did not move for summary judgment on this claim; rather, the District Court entered summary judgment *sua sponte*. FirstEnergy argues that the District Court's unprompted entry of

---

[12]FirstEnergy also argues that the District Court's grant of summary judgment to DL Resources on its unjust enrichment claim (Count III) was legally unfounded, or, alternatively, premature. See FirstEnergy Br. at 24-25. In view of our conclusion that the District Court properly granted summary judgment on the breach of contract claim, we need not address these arguments, as it is undisputed (i) that FirstEnergy would be liable for at least the same amount of damages under DL Resources' breach of contract claim as its unjust enrichment claim; and (ii) that the District Court's damage award does not double count DL Resources' contract-based damages. Put another way, then, even assuming that the District Court erred by granting DL Resources' summary judgment on its unjust enrichment claim, that error was harmless.

summary judgment on this claim deprived FirstEnergy of sufficient notice to oppose summary judgment.

Federal Rule of Civil Procedure 56 sets forth the procedures and standard for the grant of summary judgment. Rule 56(c) requires a minimum of ten days notice to the nonmoving party to afford that party an opportunity to oppose the entry of summary judgment. Our Court has "insisted on strict compliance with the procedural requirements of Rule 56(c)." Brooks v. Hussman Corp., 878 F.2d 115, 116-17 (3d Cir. 1989).

District courts may grant summary judgment *sua sponte* in appropriate circumstances. However, a district court may not generally grant summary judgment *sua sponte* unless it gives prior notice and an opportunity to oppose summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, ***so long as the losing party was on notice that she had to come forward with all of her evidence***.") (emphasis added); Prusky v. Reliastar Life Ins. Co., 445 F.3d 695, 699 n.6 (3d Cir. 2006) ("A district court may not grant summary judgment *sua sponte* unless the court gives notice and an opportunity to oppose summary judgment.") (quotation marks and citations omitted); Chambers Dev. Co. v. Passaic County Util. Auth., 62 F.3d 582, 584 n.5 (3d Cir. 1995) ("[A] judgment cannot be entered without first placing the adversarial party on notice that the court is considering a *sua sponte* summary judgment motion. The court must also provide the party with an opportunity to present relevant evidence in opposition to that motion.").

It is undisputed that neither party had notice that the District Court was considering granting summary judgment to DL Resources on its tort-based claim.[13] Nonetheless, citing Gibson v. Mayor & Council of City of Wilmington, 355 F.3d 215, 223-24 (3d Cir. 2004), DL Resources argues that FirstEnergy had "a fair

---

[13]Indeed, at oral argument, DL Resources' counsel stated candidly that he was "surprised" when the District Court granted summary judgment in DL Resources' favor on claims on which DL Resources had not sought summary judgment.

23

opportunity to put its best foot forward" on the tort-based claim insofar as FirstEnergy had filed its own summary judgment motion on those claims, and, therefore, the District Court did not err in granting summary judgment *sua sponte*. Id. at 223 (quotation marks omitted). We disagree.

In Gibson, a disgruntled former police officer, Christopher Gibson, brought a lawsuit under 42 U.S.C. § 1983 against various city officials, alleging that he was terminated pursuant to an unconstitutionally vague and overbroad police department directive, which Gibson claimed infringed on his First Amendment right to free speech, and that his right to procedural due process was violated. 355 F.3d at 221. Gibson moved for summary judgment on all of his claims and the District Court denied the motion. At the start of trial, the District Court informed the parties that it was entering summary judgment *sua sponte* against Gibson on his claims of vagueness and overbreadth. Gibson appealed, arguing that the lack of notice was fatal to the District Court's *sua sponte* grant of summary judgment. Although we noted that "the notice requirement applies to *sua sponte* grants of summary judgment," we affirmed the grant of summary judgment in that case. Id. at 223. We recognized that an exception to the notice requirement in such cases was subject to meeting the following three conditions: "(1) the point at issue is purely legal; (2) the record was fully developed[;] and (3) the failure to give notice does not prejudice the party." Id. at 219. In that case, we found that all three conditions had been met. Id. at 219, 224.[14]

None of these conditions are present in this case. To begin with, the tortious interference claim at issue here was not an abstract question of law; rather, it was, by definition, a fact-bound determination that required the District Court to weigh various

---

[14]The Court in Gibson did not express an opinion regarding whether a *sua sponte* grant of summary judgment would be appropriate where some but not all of these conditions were present. Id. at 224. We have the converse situation here, as none of the three conditions present in Gibson is satisfied in this case. Accordingly, we too have no occasion to express an opinion on this question.

24

competing considerations. Regarding the completeness of the record, though FirstEnergy did move for summary judgment, it was DL Resources that bore the ultimate burden of persuasion, so FirstEnergy was under no obligation to come forward with all of its evidence to obtain summary judgment; it merely needed to demonstrate that DL Resources could not satisfy one of the elements of its tortious interference claim. Moreover, FirstEnergy's counsel represented at oral argument that had FirstEnergy known the District Court was inclined to grant summary judgment to DL Resources on its tortious interference claim, it would have offered testimony or affidavits from Williams and Wright (i) clarifying the nature of their conversation; (ii) justifying why FirstEnergy took the course of action that it did; and (iii) explaining why its course of action was privileged. The failure to have this opportunity, FirstEnergy claims, caused it to suffer prejudice. We agree. Given the lack of notice and the fact that none of the conditions set forth in Gibson militates in favor of an exception to the notice requirement in this case, we will vacate and remand the District Court's *sua sponte* grant of summary judgment.

We hasten to add, however, that in reaching this conclusion we express no opinion on the District Court's ultimate determination that DL Resources was entitled to summary judgment on its claim of tortious interference. On remand, the District Court may well reach the same conclusion, or it may decide the issue differently following any evidentiary submissions the parties may make. For present purposes, it is sufficient to say that the District Court should have given the parties notice and the opportunity to make such submissions before granting summary judgment *sua sponte* on DL Resources' tort-based claim.

III.

For the foregoing reasons, we will affirm the judgment of the District Court in part, vacate in part, and remand for further proceedings consistent with this opinion.

25